WILLIAM E. DAVIS & SONS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
William E. Davis & Sons, Inc. v. Commissioner
Docket No. 1008-71.
United States Tax Court
T.C. Memo 1975-229; 1975 Tax Ct. Memo LEXIS 145; 34 T.C.M. (CCH) 998; T.C.M. (RIA) 750229; July 14, 1975, Filed Alfred D. Howell, for the petitioner. Michael J. O'Brien, for the respondent. GOFFE
*146 MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: Respondent determined deficiencies in petitioner's Federal income taxes as follows: Taxable Year
Ended July 31
Deficiency
1964
$ 3,751.17
1965
3,292.71
1966
11,587.76
After concessions by both parties, the primary issue for our decision is whether amounts paid by petitioner to its two officer-shareholders were reasonable in amount, and, therefore, deductible under section 162(a)(1), Internal Revenue Code of 1954. [1] The second issue involves the deductions allowable for contributions made by petitioner to its profitsharing and retirement plan, which, being limited by section 404(a)(3)(A) to 15 percent of the compensation accrued or paid, necessarily depends upon our decision on the first issue. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. William E. Davis & Sons, Inc., (hereinafter called petitioner) is a corporation organized and doing business under the laws of the State of Oklahoma. Its *147 principal place of business is located in Oklahoma City, Oklahoma. During the years in question, petitioner used the accrual method of accounting and a fiscal year ending July 31. It filed its Federal income tax returns for the taxable years ended July 31, 1964, 1965 and 1966 with the Director of the Internal Revenue Service Center at Austin, Texas. At all times pertinent hereto, all of petitioner's issued and outstanding stock has been owned one-half by its president, William E. Davis and one-half by its secretary-treasurer, Margaret H. Davis. William and Margaret Davis, husband and wife, organized the business of petitioner in 1953 as an equal partnership, and petitioner is the result of incorporating that partnership on August 1, 1959. Petitioner is a wholesale distributor of groceries and related items to institutional customers such as schools, restaurants, hospitals, hotels, clubs and nursing homes. Such a business differs in many respects from that of a wholesale distributor who sells only to retail grocers. The most notable difference is that the institutional distributor realizes a greater margin of profit on his sales than a distributor selling solely to retail grocers. *148 During the years at issue herein, and prior to that time, petitioner was the only Oklahoma-based distributor of groceries specializing in sales to the institutional customer. William E. Davis graduated from the University of Nebraska in 1935 with a degree in business administration. He then entered military service as a second lieutenant and served in both the Pacific and European theaters during World War II. He left the service as a lieutenant colonel after the war and went to work for the John Saxton Co., a national institutional wholesaler, in its branch office located at Dallas, Texas. He was assigned a sales territory based in Oklahoma City where he worked for six years, resigning to establish the partnership which subsequently was incorporated as petitioner. Margaret Davis attended the University of South Carolina and graduated when she was 19. She worked with the South Carolina Historical Commission and then as the society editor of a newspaper. She attended law school until she married in 1943. During the second world war she did a daily 15-minute women's program for a radio station in Columbia, South Carolina, and then left to do public relations work for the Office *149 of Price Administration where she wrote radio programs and speeches for OPA department heads. The Davises together managed the business of petitioner from its inception through the taxable years in question. Together they formulated petitioner's policies. Mr. Davis was petitioner's president and Mrs. Davis its secretary-treasurer. While Mr. Davis was the head of the business and Mrs. Davis was second in command, she effectively ran the entire operation while he was handling sales in the field. During the first few years of the partnership's operation, Mr. Davis spent most of his time in the field handling and developing sales. He devoted his full time to petitioner, specializing in sales and developing new territories, training salesmen, improving product and service promotion, and generally performing other public relations functions for the company. Mrs. Davis also worked full-time for petitioner. During the first years of the partnership's operation, she worked most nights and weekends, as did Mr. Davis. Even during the years in issue she worked nearly every Saturday and on Sundays, when necessary. Her duties centered primarily around the management of the office and administration *150 of the business and consisted, in addition to being in charge during Mr. Davis' extensive absences, of purchasing, employment and supervision of all office and warehouse personnel, performing and later supervising all billing, posting to the accounts payable ledger, approving checks, approving credit for customers and arranging bank credit for petitioner, attending trade association meetings, supervising all accounting functions, handling all claims, conferring with petitioner's banker and accountant, setting up and administering petitioner's fringe benefit programs and taking primary responsibility for other management duties. As the business grew and additional office employees were hired, Mrs. Davis' duties became more supervisory and less manual than they had been in earlier years. During the years in issue, the nature of activities and duties for petitioner remained essentially the same, given the added responsibilities of a rapidly growing business. Together the Davises conceived and operated a successful annual promotional food show, an innovation in its geographical area. They also conceived and published a promotional recipe book for institutions and a market newsletter *151 which included information about petitioner and new products and ideas which would be of interest to institutions. Both of these publications were novel to the industry. From petitioner's inception until July 5, 1966, Howard T. Baugh, Jr., had the title of vice president, but performed no services and received no compensation from petitioner other than that received for writing its insurance. On July 5, 1966, Clay Waggoner was appointed vice president of petitioner but performed very few of the executive or administrative functions of such an officer. Prior to this time, Waggoner was a salesman for petitioner and had been given the title of sales manager in 1962 although his function was primarily that of a sales supervisor. As such, Waggoner trained salesmen and worked with them in the field. He also assisted Mr. Davis in establishing new territory and in promotional work and was often consulted regarding sales. He also occasionally represented petitioner at conventions and exhibits and at national and regional meetings. Petitioner's board of directors consisted of Mr. and Mrs. Davis and Baugh during the years in issue until December 20, 1965, when Waggoner replaced Baugh on the *152 board of directors. When petitioner's predecessor, the Davis Wholesale Grocery Co. (hereinafter referred to as the partnership) opened its warehouse on August 1, 1953, there was only one employee in addition to the Davises, a driver-warehouse man who did the receiving, stocking and delivering. During the years the partnership operated the business, one salesman was added to the sales force during each year. By 1964, petitioner's total sales force consisted of approximately 10 to 12 salesmen. Although Mr. Davis still made sales calls during the taxable years in issue, he spent considerably less time in the field than he had during the early years of business when he was its only salesman. With this notable exception, Mr. Davis' duties remained essentially the same as in prior years except for the greater responsibility necessitated by the significant growth in petitioner's sales. Although Mrs. Davis also worked full time for petitioner, she had many outside interests and activities. At the beginning of 1964, the Davises had six children ranging in ages from 6 to 17. All of these children were in school during the years in issue and Mrs. Davis took them to school, which was two *153 blocks away, in times of bad weather. She rarely, if ever, picked them up at school. Mrs. Davis often took some of the children to their evening swim team practice sessions during the week, as well as driving them to weekend swim meets, which were occasionally held out-of-state. Mrs. Davis was a member of the local YWCA, and would often go there at night to do her water exercises. She also belonged to the local PTA and attended its monthly evening meetings. Mr. and Mrs. Davis were members of a duplicate bridge club which met one night a month. The Davises lived less than 5 minutes from petitioner's office. During the years in issue, Mrs. Davis would generally arrive at work between 8:30 and 9:00 o'clock and leave at 6:00 o'clock or later. She went home for lunch practically every day. Although it was difficult to get domestic help, she was able to secure babysitters who would be at home when the children returned from school. In 1964 petitioner employed four full-time and four part-time employees in addition to 12 to 14 warehouse personnel who operated approximately ten delivery trucks. Petitioner never attempted to hire an office manager. On May 9, 1962, petitioner entered *154 into a "deferred compensation agreement" with Waggoner. This agreement served not only as recognition of Waggoner's efforts for petitioner, but also as an inducement for him to remain in petitioner's employ. It also provided for payment of $ 10,000 to certain named beneficiaries in the event of Waggoner's death while in petitioner's employ. Waggoner served during the years in issue as one of the trustees of petitioner's deferred profitsharing and retirement plan for its employees. The other trustees were Mr. and Mrs. Davis. This plan was established on July 31, 1964. The following schedule depicts pertinent operating information from petitioner's income tax returns and the stipulation of facts from petitioner's incorporation through the taxable years at issue: Taxable Year
Taxable
Net Income
Ended 7/31
Sales
Income
After Taxes
1960
$ 779,000.00
$ 0
$ 3,039.67
1961
975,000.00
23,103.00
16,172.55
1962
1,214,000.00
22,949.00
16, 064.38
1963
1,459,000.00
28,694.00
19,273.15
1964
1,611,538.35
22,629.85
17,651.19
1965
1,746,079.73
23,266.73
18,492.32
1966
2,081,321.92
36,912.90
26,568.12
Non-deferred
Compensation
Compensation
Taxable Year
Net
Paid to
Paid to
Ended 7/31
Worth
Officer-Shareholders
All other
employees *
1960
$ 10,000.00
$ 18,000.00
$ ----
1961
13,039.67
18,000.00
----
1962
29,212.22
28,000.00
----
1963
45,276.60
28,000.00
----
1964
64,549.75
40,000.00
128,211.00
1965
81,990.93
40,000.00
144,300.00
1966
100,483.25
54,000.00
172,042.00
*155 The following chart reflects the amounts of compensation paid to petitioner's president and secretary-treasurer and the amounts of contributions made to petitioner's profit-sharing and retirement plan for their benefit, as well as the amounts allowed by respondent in his statutory notice of deficiency: COMPENSATION OF PETITIONER'S OFFICER-SHAREHOLDERS
NON-DEFERRED
WILLIAM E. DAVIS, PRESIDENT
MARGARET A. DAVIS,
SECRETARY-TREASURER
FYE
Allowed by
Allowed by
7/31
Salary
Bonus
Total
Respondent
Salary
Bonus
Total
Respondent
1960
$ 12,000
$ 0
$ 12,000
$ ---
$ 6,000
$ 0
$ 6,000
$ ---
1961
12,000
0
12,000
---
6,000
0
6,000
---
1962
19,000
0
19,000
---
9,00 0
0
9,000
---
1963
19,000
0
19,000
---
9,000
0
9,000
---
1964
19,000
6,000
25,000
25,000
9,000
6,000
1 5,000
12,000
1965
19,000
6,000
25,000
25,000
9,000
6,000
15,000
12,000
1966
36,000
0
36,000
25,000
18,000
0
18,000
12,000
DEFERRED
WILLIAM E. DAVIS
MARGARET A. DAVIS
FYE
Amount
Amount Allowed
Amount
Amount Allowed
7/31
Contributed *
by Respondent
Contributed *
by Respondent
1964
$ 3,750
$ 3,750
$ 2,250
$ 1,800
1965
3,750
3,750
2,250
1,800
1966
5,400
3,750
2,700
1,800
*156 The following chart summarizes pertinent actions of petitioner's board of directors regarding salaries and bonuses: Date of Meeting
Action Taken
Person Affected
Amount
April 3, 1962
Bonuses Authorized
William Davis *
7,000
Margaret Davis *
3,000
April 2, 1963
Salary Set
William Davis *
19,000
Margaret Davis *
9,000
July 8, 1964
Bonuses Authorized
William Davis *
6,000
Margaret Davis *
6,000
Clay Waggoner
2,500
July 21, 1965
Bonuses Authorized
William Davis *
6,000
Margaret Davis *
6,000
Clay Waggoner
3,500
Robert Johnson
1,000
(Sales Supervisor)
14 other employees
3,781.25
July 5, 1966
Salary Set
William Davis *
36,000
Margaret Davis *
18,000
Bonuses Authorized
Clay Waggoner *
4,000
Robert Johnson
2,750
Charles Haskell
1,100
12 other employees
8,540
Petitioner did not declare or pay any dividends from its incorporation through its taxable *157 year ended July 31, 1966. ULTIMATE FINDINGS OF FACT 1. Amounts paid by petitioner to William Davis and Margaret Davis in the taxable years ended July 31, 1964 through 1966, constituted reasonable compensation for services rendered by them. 2. Petitioner may only deduct that portion of its contributions to its profit-sharing and retirement plan which does not exceed 15 percent of the compensation accrued. OPINION Section 162(a)(1) provides that a corporation, in computing its taxable income, is allowed a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on its trade or business including "a reasonable allowance for salaries or other compensation for personal services actually rendered." The first issue for our decision is whether the amounts paid by petitioner to its two officer-shareholders during the years in issue, plus contributions made to a profit-sharing and retirement trust on their behalf, [2] are deductible as reasonable compensation for services rendered. *158 Petitioner has the burden of showing that the amounts paid to its employees were, in fact, reasonable compensation for services rendered and thus deductible as ordinary and necessary expenses. Botany Worsted Mills v. United States,278 U.S. 282 (1929); Rota-Cone Oil Field Op. Co. v. Commissioner,171 F.2d 219, 222 (10th Cir. 1948); Perlmutter v. Commissioner,373 F.2d 45 (10th Cir. 1967), a affg. 44 T.C. 382 (1965); Rule 142(a), Tax Court Rules of Practice and Procedure.
The issue is a factual one and must be decided on the basis of all the facts in each particular case. Pepsi-Cola Bottling Co. of Salina, Inc.,61 T.C. 564, 567 (1974), on appeal (10th Cir. May 16, 1974); Golden Construction Co., Inc., v. Commissioner,228 F.2d 637, 638 (10th Cir. 1955). The salary of each officer is to be judged separately in determining whether it is reasonable. L. Schepp Co.,25 B.T.A. 419, 429-430 (1932). *159 Courts have examined the following factors, among others, in determining whether compensation is reasonable: 1. Employee's qualifications and training. 2. Nature, extent, and scope of his duties. 3. Responsibilities and hours involved. 4. Size and complexity of the business. 5. Results of the employee's efforts. 6. Prevailing rates for comparable employees in comparable businesses. (See section 1.162-7(b)(3), Income Tax Regs.) 7. Scarcity of other qualified employees. 8. Ratio of compensation to gross and net income (before salaries and Federal income tax) of the business. 9. Salary policy of the employer to its other employees. 10. Amount of compensation paid to the employee in prior years. 11. Employee's responsibility for employer's inception and/or success. 12. Time of year the compensation was determined. 13. Whether compensation was set by corporate directors. 14. Correlation between the stockholder-employees' compensation and his stockholdings. 15. Corporate dividend history. 16. Contingent compensation formulas agreed on prior to the rendition of services and based upon a free bargain between the employer and employee. *160 (See section 1.162-7 (b)(2), Income Tax Regs.) 17. Under-compensation in prior years. 18. Compensation paid in accordance with a plan which has been consistently followed. 19. Prevailing economic conditions. 20. Whether payments were meant as an inducement to remain with the employer. 21. Examination of the financial condition of the company after payment of compensation. See Mayson Manufacturing Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), remanding a Memorandum Opinion of this Court; Irby Construction Company v. United States,290 F.2d 824 (Ct. Cl. 1961); First Trust & Savings Bank,Moville, Iowa, an unreported case ( N.D. Ia. 1966, 19 AFTR 2d 695, 67-1 USTC par. 9233), see jury instruction 10; 4A Mertens, Law of Federal Income Taxation, sec. 25.69 etseq.
Although we refer specifically only to those factors on which we placed our greatest reliance, we have considered all relevant criteria in reaching our decision. Based on a thorough review of the record, we find that petitioner has satisfied its burden of showing, by a preponderance of the evidence, that the compensation *161 paid was reasonable. While we cannot be expected to determine a reasonable salary with mathematical precision, Clinton Co. v. Commissioner,159 F.2d 102, 104 (7th Cir. 1946), and the cases cited therein, we are satisfied that the payments made here were within the range of reasonableness. First, William and Margaret Davis were welleducated and had significant, successful experiences in petitioner's field. William had worked six years with a large institutional distributor before starting petitioner's predecessor and both he and Margaret Davis had worked more than 10 years for petitioner or the partnership by 1964, the first year at issue here. Next, we examined the nature and scope of their duties. Not only were these duties extensive, but the Davises also devoted their full time to petitioner, including nights and weekends, and bore the ultimate responsibility for the success of its business. The record shows that petitioner's growth during the years in issue was in large measure due to their ability, experience, innovation and hard work. [3]
*162 We do not agree with respondent's assertion that Mrs. Davis' family activities diminished her value to petitioner. While these activities were extensive, they occurred outside of her long business hours and did not interfere with her successful administration of petitioner's affairs. At trial, petitioner presented the testimony of several expert witnesses. The first two, other than Clay Waggoner, were its banker and its accountant. Since neither demonstrated any particular knowledge regarding compensation paid in either the wholesale grocery industry or the institutional food distributing business, we accorded little weight to their testimony. Petitioner's next witness, Merle Feinberg, was an officer of a much larger wholesale grocery distributor, also located in Oklahoma City. Feinberg had been in the business for 48 years. In 1970, based on petitioner's success and its own declining fortunes, his company abandoned its retail distribution business to devote its efforts to the institutional field. He testified that William and Margaret Davis had an excellent knowledge of their business and that their salaries were reasonable considering the fact that petitioner produced greater *163 relative net profits and year-to-year increases in sales with far fewer officers than Feinberg's company. Even considering the differences between the retail and institutional food distribution businesses, we found this testimony very convincing. Petitioner also offered the testimony of Dr. E.J. Schmidlein, Jr., a professor of accounting at Southern Illinois University at Carbondale, Illinois, who prepared an annual survey of the members of the Association of Institutional Distributors. His survey showed that the average ratio of officers' salaries to net sales of institutional distributors having annual sales of 3 million dollars or less was as follows: 1964
2.48%
1965
2.29%
1966
2.59%
We find on the basis of Schmidlein's testimony that petitioner's ratios were not significantly different from the average ratios for distributors of petitioner's relative size. Schmidlein also testified that, in his opinion, the salaries which petitioner paid to officer-shareholders were reasonable considering its rapid sales growth relative to the industry. He explained that their individual salaries may have been higher than officers of other similar companies but that this *164 was due to the fact that petitioner had only two officers carrying the load that other companies of its size would have delegated to more persons. We believe that the Davises are entitled to compensation which gives due weight to their foresight, innovation, knowledge of the industry, relative workloads vis-a-vis other executives in their industry, and their devotion to petitioner's affairs. Their skills and hard work were best demonstrated by petitioner's early success and its rapidly increasing sales. We find that the compensation paid was not unreasonable considering these factors and petitioner's net worth. Substantial sums were left in the business to provide necessary working capital. Compare Klamath Medical Service Bureau,29 T.C. 339-347 (1957), affd. 261 F.2d 842 (9th Cir. 1958), cert. denied 359 U.S. 966 (1959). Although we have found that the compensation paid was reasonable in the years at issue, we were disturbed by several factors. First, petitioner failed to pay or declare any dividends from its incorporation through the years at issue. [4] *165 Even though a payment is reasonable, it is not deductible to the extent it represents a distribution of corporate profits rather than compensation. Section 1.162-7(a), Income Tax Regs., provides that the test of deductibility is whether the compensation payments are reasonable and are in fact payments purely for services rendered. See also Anthony Mennuto,56 T.C. 910, 921 (1971), and the cases cited therein. Close scrutiny is particularly warranted in the case of payments by a closely-held corporation to its officer-shareholders since the opportunity for abuse in such cases is great where unrelated shareholders are either absent from, or form a complaint minority of the board of directors. Petitioner argued that its capital requirements precluded the payment of dividends. However, this argument is not applicable here since the amounts in issue were not retained in the business, but disbursed. *166 Second, we were disturbed by the fact that the salaries and bonuses were determined in the last quarter of the year, when the relative profitability for the year could be determined with reasonable accuracy. In some cases such action may indicate that the compensation represents the distribution of corporate profits rather than the value of the expected services. However, in other cases this is the best time for determining what services have been performed, as in the case of a bonus. We believe this is the case here. [5] Compare Pepsi-Cola Bottling Co. of Salina, Inc.,61 T.C. 564, 568 (1974), on appeal (10th Cir. May 16, 1974); see also Klamath Medical Service Bureau,supra and the cases cited therein at 347.
Third, while we had some difficulty with the comparatively large *167 increase in the shareholder-officers' salaries for 1966, we believe that these reflect the indispensability of the Davises' services to petitioner, in addition to the increased workload and responsibilities engendered by petitioner's steadily increasing sales, rather than an effort to extract dividend payments. Compare Ridgewood Provisions, Inc.,6 T.C. 87, 90 (1946). We see no reason why owner-employees should be paid less than comparable nonshareholder key employees. Despite the presence of these adverse factors, we are satisfied on the basis of the record as a whole that the compensation paid to William and Margaret Davis represented reasonable compensation for services actually rendered during the years in issue. The second issue involves the deductions allowable for contributions to a profit-sharing and retirement plan. Since the deduction is limited by section 404(a)(3)(A) to 15 percent of the compensation paid, our decision on the first issue is determinative here. To reflect the concessions of the parties and our conclusions with respect to the issues in controversy, *168 Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years at issue, unless otherwise indicated.↩
*. as a group↩
*. Computed on the basis of 15 percent of total non-deferred compensation, although taxpayers would be entitled to slightly more than 15 percent under the formula of the plan.↩
*. Member, board of directors.↩
2. Pension payments constitute compensation and must be considered in determining whether the total compensation paid by petitioner was reasonable. Barton-Gillet Co.,T.C. Memo 1970-157, affd. 442 F.2d 1343 (4th Cir. 1971); Edwin's, Inc. v. United States,501 F.2d 675↩ (7th Cir. 1974).
3. As was noted in Edwin's, Inc. v. United States,501 F.2d 675, 678↩ (7th Cir. 1974), ownership, while not justifying a higher salary than would be paid to a comparable non-owner employee, is a factor which cannot be ignored. "[The] owners of a business, particularly one which they have built up from scratch, will have the personal incentive not necessarily shared by hired help, and will devote those extra ounces of energy, thought, and devotion that will spell not merely the difference between success and failure but the difference between success and extraordinary success." [Fn. ref. omitted.]
4. This factor permitted the respondent to argue that part of the compensation paid represented a dividend. Other cases have noted that the stockholders of a profitable business will not long endure a situation which yields no return on their invested capital. While the absence of dividends may indicate the presence of disguised dividends, it does not convert compensation determined to be reasonable into dividends. Compare Carole Accessories, Inc.,T.C. Memo 1973-273; Charles McCandless Tile Service v. United States,422 F.2d 1336, 1339-1340 (Ct. Cl. 1970); Giles Industries, Inc. v. United States,496 F.2d 556 (Ct. Cl. 1974); Charles Schneider & Co., Inc.,T.C. Memo 1973-130↩.
5. Several cases have noted that officer-shareholders do not need the incentive of a bonus to produce their best efforts. See Irby Construction Co. v. United States,290 F.2d 824, 826 (Ct. Cl. 1961); Charles Schneider & Co., Inc.,T.C. Memo 1973-130↩.