## In re RAE'S ESTATE.

## STIENING v. COMMISSIONER OF INTERNAL REVENUE.

### No. 8608.

Circuit Court of Appeals, Third Circuit.

Argued Nov. 21, 1944.

Decided Jan. 18, 1945.

R. J. Cleary, of Pittsburgh, Pa. (Lee W. Eckels, of Pittsburgh, Pa., on the brief), for petitioner.

Melva M. Graney, of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, and Robert N. Anderson, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before MARIS and GOODRICH, Circuit Judges, and SCHOONMAKER, District Judge.

**SCHOONMAKER, District Judge.**

This case is before this court on appeal from the decision of the Tax Court of the United States at Docket No. 108,736 (opinion reported as CCH Decision 13, 159M), and involves a redetermination of the income-tax liability of decedent Walter S. Rae for the calendar years 1936 and 1937.

Three questions are presented on this appeal: (1) Was decedent taxpayer entitled under Section 23(e) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 828 to loss deductions in 1936 on the Westberg patents and cement guns manufactured thereunder; (2) Were the Tax Court's findings that the amounts of $7500 and $10,000 salary deductions under Section 23 (a) for services of Walter S. Rae, Jr., performed for decedent taxpayer in 1936 and 1937, a reasonable compensation; (3) Was the transaction whereby taxpayer disposed of his interests in Wellston No. 2 Company, a compromise of a bad debt as contended by petitioner, or as the Tax Court found, the sale of capital assets as to which Section 117 of the 1936 Act is applicable.

### I.

#### The Westberg Patents and Cement Guns Manufactured Thereunder.

The Tax Court found that there was no abandonment by taxpayer in 1936 either of his half interest in the Westberg patent or the cement guns he manufactured under the patent. Abandonment is an identifiable event and must be shown by an affirmative act of abandonment: Helvering v. Jones, 8 Cir., 120 F.2d 828, 830; Certiorari denied, 314 U.S. 661, 62 S.Ct. 115, 86 L.Ed. 529. The rule to be applied is well stated in Commissioner of Internal Revenue v. McCarthy, 7 Cir., 129 F.2d 84, 87, by Circuit Judge Sparks, as follows:

"The rule to be deduced from the 'abandonment' cases, we think, is that a deduction should be permitted where there is not merely a shrinkage of value, but instead, a complete elimination of all value, and the recognition by the owner that his property no longer has any utility or worth to him, by means of a specific act proving his abandonment of all interest in it, which act of abandonment must take place in the year in which the value has actually been extinguished."

The United States Supreme Court very recently in the case of Commissioner of Internal Revenue v. Scottish American Investment Company, 65 S.Ct. 169, 171, filed an opinion on December 4, 1944, wherein the rule to be applied to the

fact findings of the Tax Court is stated as follows:

"* * * The Tax Court has the primary function of finding the facts in tax disputes, weighing the evidence, and choosing from among conflicting factual inferences and conclusions those which it considers most reasonable. The Circuit Courts of Appeal have no power to change or add to those findings of fact or to re-weigh the evidence. And when the Tax Court's factual inferences and conclusions are determinative of compliance with statutory requirements, the appellate courts are limited to a determination of whether they have any substantial basis in the evidence. The judicial eye must not in the first instance rove about searching for evidence to support other conflicting inferences and conclusions which the judges or the litigants may consider more reasonable or desirable. It must be cast directly and primarily upon the evidence in support of those made by the Tax Court. If a substantial basis is lacking the appellate court may then indulge in making its own inferences and conclusions or it may remand the case to the Tax Court for further appropriate proceedings. But if such a basis is present the process of judicial review is at an end. Helvering v. National Grocery Co., 304 U.S. 282, 294, 58 S.Ct. 932, 938, 82 L.Ed. 1346; Wilmington Trust Co. v. Helvering, 316 U.S. 164, 168, 62 S.Ct. 984, 986, 86 L.Ed. 1352; Commissioner [of Internal Revenue] v. Heininger, 320 U.S. 467, 475, 64 S.Ct. 249, 254; Dobson v. Commissioner [of Internal Revenue] 320 U.S. 489, 64 S.Ct. 239."

The decedent taxpayer acquired a half interest in these patents in 1935, paying therefor $22,000, and expending $6,068.25 in acquiring and developing them.

Thereafter, in 1935, at a cost of $5,083.72, he manufactured five cement guns under the drawings and specifications of the patents. These Westberg guns did not perform to the taxpayer's satisfaction. During 1936 many experiments were made to correct the faults encountered in ·their use, and the taxpayer had the guns re-designed and rebuilt at a cost of $7,483.86. The taxpayer believed that the guns, although costing considerably more to manufacture, would prove superior to the Allentown gun then generally in use in the construction business. However, the Westberg guns did not perform to his satisfaction. Many difficulties were encountered in their operation, partly due to their use in work they were not best suited to do, and in part due to lack of skill of the operator. In 1936 he stated he was through with the Westberg guns, and that he was fed up with them. Nevertheless, he used some of the guns in his own business during 1936; caused a prospectus to be issued in November 1936, whereby he hoped to exploit the sale of the guns in the territory assigned to him under the agreement with Westberg; and by entries dated December 31, 1936, capitalized $5,353.09 of the cost of rebuilding the guns as "Plant and Equipment" on his books.

In March 1937, one of the rebuilt Westberg guns was sold to the Utah Construction Company for the sum of $2000; another gun was shipped in 1936 to a firm in Australia, and was returned without cost to the taxpayer. The taxpayer was not successful in establishing a market for the guns, those he manufactured being used principally in his personal construction business. He owned the four remaining Westberg guns at his death and at that time they were carried on his books of account at a net book value of $2,496.13.

The patents themselves were carried as assets on the taxpayer's books until his death and were amortized in the years 1936, 1937, 1938, and 1939. They were also shown as assets in 1936 and 1938 in financial statements which taxpayer filed for credit purposes with the Union Trust Company of Pittsburgh, being listed as costing $22,000, and their net cost after amortization prorated over their legal life of seventeen years. In original and amended tax-returns for 1936, 1937, and 1938, deductions were claimed for amortization of the patents on the basis of their legal life.

In addition to that, there is evidence to which the Tax Court did not specifically refer; i. e., the testimony of Walter S. Rae, Jr., the taxpayer's son, who was closely associated with the taxpayer in his business, to the effect that taxpayer never expressed to him any intent to abandon the patents or guns, but showed a very decided interest in the patents. Rae, Jr., stated that the taxpayer and Westberg, the owner of the other half interest in the patents, built a "Grainium Loader" under the patents, which was successful; and as to the cement guns, he stated (Tr. 5810582) that taxpayer never gave up the guns; that they were still in

the warehouse; and that the only reason they were not in active use was the fact that the bidding and the prices on that particular type of work to which the guns were suitable were such that his father and he were not interested.

We are therefore of the opinion that the Tax Court had abundant evidence to support its findings that there was no abandonment in 1936 of the patents or the cement guns manufactured thereunder.

## II.

### Salary of Walter S. Rae, Jr.

The Tax Court found that the amounts of $7500 and $10,000 for Walter S. Rae, Jr., was a reasonable salary deduction for the years 1936 and 1937 under Section 23 (a) of the 1936 Act. The Tax Court found that Rae, Jr., was employed in connection with the taxpayer's business in his father's office continuously from 1930 until the death of the latter in November 1939, at a stated salary which, at the time of the taxpayer's death, was $3000; that under date of January 15, 1936, the taxpayer wrote Rae, Jr., a letter to the effect that he would not increase his son's salary; but effective from the first of January, 1936, there would be added to his yearly salary a bonus of forty-five per cent. of the net earnings of the construction business. Rae, Jr., was actually paid the salary item of $3000 in the years 1936 and 1937. On December 31, 1936, the amount of $22,499.20 was debited to "Profit and Loss," and credited to an account captioned "Walter S. Rae, Jr.—Loan No. 81," an account payable on taxpayer's books. The sum of $21,865.69 was similarly charged on taxpayer's books on December 31, 1937. The credited amounts were not drawn by Walter S. Rae, Jr., during 1936 and 1937.

The evidence discloses that the taxpayer's son is a graduate civil engineer; was given opportunity by the taxpayer to acquire experience in all the phases of the business; that over the years the taxpayer gradually increased the responsibilities entrusted to his son.

In the early part of his employment with taxpayer, Rae, Jr., acted as a field superintendent. In 1935 he was given responsibility in the office, and in 1936, he worked in close cooperation with his father in the supervision and general operation of the office. In 1936 and 1937, while the greater part of his time was spent in the office, he traveled to various work under construction and to prospective jobs on which his father desired to submit a bid.

During this period the taxpayer also employed one Ambrose R. West, a registered engineer, whose principal duty was that of an estimator. The taxpayer and his son also worked on estimates, but the final bid was made up and submitted by taxpayer or by his son under taxpayer's instructions. West was paid a salary of $3000 a year in 1936 and to September 1937, when it was increased to $275 a month. Taxpayer also employed another engineer, Howard Nestlerode, at a salary of $85 per week.

The evidence shows that the salaries paid by other concerns engaged in construction work ranged from $300 to as high as $1000 per month for services of similar character to that performed by taxpayer's son. The Tax Court found that the reasonable value of the services performed by Rae, Jr., in the taxpayer's business was $7500 for 1936, and $10,000 for 1937.

The main complaint of petitioner seems to be that the Tax Court did not accept the opinion-testimony of five of petitioner's witnesses, who testified that the total payment and allowances by taxpayer to his son for the years 1936 and 1937 were reasonable. That the Tax Court did consider that testimony is evident from its memorandum opinion (30a, R. 31a), and its final conclusion thereon (R. 32a), where it is stated:

"Viewing the matter in the light of the facts and all the circumstances presented in the entire record we have found that a reasonable compensation for the services of Walter S. Rae, Jr., actually rendered in decedent's business for the year 1936 was $7500, and $10,000 for the year 1937."

With reference to the letter dated January 15, 1936, wherein taxpayer agreed to add to his son's salary a bonus of 45% of the net earnings of the construction business, that agreement does not establish the reasonableness of the salary: Botany Mills v. United States, 278 U.S. 282, 49 S.Ct. 129, 73 L.Ed. 379. The Tax Court was not required to accept the opinion-evidence of petitioner's witnesses as to total salary to be paid to Walter S. Rae, Jr. See Am-Plus Storage Battery Co. v. Commissioner of Internal Revenue, 7 Cir., 35 F.2d 167, 169; E. Wagner & Son v. Commissioner of Internal Revenue, 9 Cir., 93 F.2d 816, 819. The Tax Court's finding as to the amount constituting reasonable com-

pensation is a finding of fact: Am-Plus Storage Battery Co. v. Commissioner of Internal Revenue supra; E. Wagner & Son v. Commissioner of Internal Revenue, supra; Lydia E. Pinkham Medicine Co. v. Commissioner, 1 Cir., 128 F.2d 986, 990, 145 A.L.R. 827; Helvering v. Superior Wines & Liquors, 8 Cir., 134 F.2d 373. That finding is conclusive, if supported by substantial evidence. The Supreme Court made this plain in Wilmington Co. v. Helvering, 316 U.S. 164, 168, 62 S.Ct. 984, 986, 86 L. Ed. 1352, where it is stated:

"* * * It is the function of the Board, not the Circuit Court of Appeals, to weigh the evidence, to draw inferences from the facts, and to choose between conflicting inferences. The court may not substitute its view of the facts for that of the Board. Where the findings of the Board are supported by substantial evidence they are conclusive. * * *"

■ We are therefore of the opinion that the findings of the Tax Court were justified by the evidence received by it, and that we cannot substitute our own opinion as to the value of these services for that of the Tax Court.

### III.

### Wellston No. 2 Company.

■ The petitioner contends that the loss taxpayer sustained in 1937 upon assignment to Roy J. Gillen of his claims, rights, titles, and interests in the Wellston No. 2 Company, is deductible in full as a bad debt under Section 23(k) of the 1936 Act. The Tax Court rejected this contention, holding that the transaction was in fact a sale of capital assets governed by Section 117 of the 1936 Act; and that by this provision of the Act the only allowable loss deduction was $2000, which the petitioner claimed and was allowed on his original tax return.

The facts, as found by the Tax Court on which it based its conclusion, may be briefly stated as follows:

Taxpayer was a large stockholder in the Wellston No. 2 Company, an Ohio corporation engaged in mining coal by the stripping process. His son, Walter S. Rae, Jr., was president of the company. From October 28, 1933, to March 1, 1937, taxpayer advanced to, or on behalf of the Wellston No. 2 Company, various amounts aggregating $90,564.10 against which he received payments of $64,329.14. On April

12, May 7, and May 22, 1934, respectively, the company executed and delivered to taxpayer three demand notes of $15,000, naming him as payee. In 1937 taxpayer disposed of all his right, title and interest in the company through a transaction with Roy J. Gillen. In 1937 income tax return, taxpayer treated the transaction as to the disposition of capital assets insofar as two of the notes of the Wellston No. 2 Company was concerned. He reported a capital loss of $16,861.90 thereon, claiming and being allowed a deduction of $2000 under Section 117 of the Revenue Act of 1936, which relates to the sale or exchange of capital assets. By amendment to the petition in this case, the taxpayer's executrix asserted this was not a capital transaction, but that all of the taxpayer's claims against the Wellston No. 2 Company were satisfied in connection with the reorganization of that company by receipt of less than his basis for those claims, so that his loss on the two notes was deductible in full as an ordinary loss.

On February 20, 1937, the Wellston No. 2 Company filed a voluntary petition in bankruptcy in the District Court for the Southern District of Ohio, Eastern Division, alleging insolvency; and on that day the company was adjudged a bankrupt. On the same day also, creditors of this company moved the court for leave to file a petition under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. On March 9, 1937, the court entered an order approving the petition as properly filed, and consolidating these two proceedings. In that same month the taxpayer filed a "Proof of Priority Debt" and also "Proof of Unsecured Debt." Under a written agreement executed the same day, taxpayer agreed to sell, assign, transfer and deliver to Roy J. Gillen all his right, title and interest in certain claims against the Wellston No. 2 Company. Gillen agreed to accept the right, title and interest of taxpayer to those claims and also agreed to assume the obligations taxpayer had incurred in executing indemnitor agreements on two Seaboard Surety Company bonds. And as a part of that agreement, the taxpayer assigned all his interest in his stock in the Wellston No. 2 Company to Roy J. Gillen. The actual consideration paid by Gillen to the taxpayer was $8000, out of which taxpayer paid his attorneys $400 and expenses of $1.75.

· On May 27, 1937, the date of the agreement between the taxpayer and Gillen, the

209

Wellston No. 2 Company filed in the bankruptcy proceedings a plan of reorganization, which provided, inter alia, that Gillen was to purchase and deliver to the debtor corporation all indebtedness and full releases from Walter S. Rae, Jr., amounting to $38,995.68, and to pay to the Debtor Corporation the sum of $2000, in consideration of which the Debtor Corporation was to execute and deliver a note secured by chattel mortgage on certain equipment in the sum of $15,000; said chattel mortgage to be a first and best lien on the equipment so covered.

On confirmation of the plan of reorganization, the court entered an order containing, among other things:

"All claims of Walter S. Rae, and Walter S. Rae, Jr., against said Debtor, which claims have heretofore been purchased by Roy J. Gillen, are hereby cancelled and extinguished in accordance with the provisions of said plan."

There was no liquidation of the company in 1937. No new stock was issued and no new corporation was formed. There was no reorganization of the company and the plan did not contemplate one. The company was merely relieved of the pressing demands of certain of the creditors by the financial aid given it by Gillen and West, continuing operations as theretofore.

Under these facts, we are of the opinion that the Tax Court correctly held that the loss taxpayer sustained by the disposal of his claims, rights, titles, and interests in the Wellston No. 2 Company, did not result from the compromise of a bad debt, permitting the deduction of the loss in full, but resulted from the sale of capital assets, limiting the allowable loss under Section 117 of the 1936 Act to $2000, the amount the taxpayer originally claimed and was allowed.

There were two separate transactions here,—one between taxpayer and Gillen, and the other between Gillen and the Company. By the first transaction, taxpayer sold his claim, rights, and interests in the Company to Gillen; and by the other, Gillen became a preferred creditor of the Company. The two are not so interrelated that we can hold that the result was a compromise of a bad debt against the Company.

The judgment of the Tax Court is affirmed.