EQUITY PLANNING CORPORATION AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Equity Planning Corp. v. Commissioner
Docket No. 21808-80.
United States Tax Court
T.C. Memo 1983-57; 1983 Tax Ct. Memo LEXIS 735; 45 T.C.M. (CCH) 610; T.C.M. (RIA) 83057; January 31, 1983. *735 Petitioner is a corporation in the business of real estate investment, management and development. In 1972, it purchased an undivided 50-percent interest in an apartment building project to be built by Tom Hill. Petitioner immediately leased back its interest in the project to Mr. Hill. In May of 1972, it assigned its rights under the purchase agreement to the limited partnership Equity St. Petersburg. The purchase price for petitioner's interest was $540,000 plus one-half of the amount of permanent mortgage financing to be obtained by Mr. Hill. Mr. Hill was to obtain financing and complete the project by February 28, 1973. Pursuant to the 25-year lease, he was to pay rent to petitioner amounting to $54,000 plus one-half of the total mortgage payments due on the property plus a prescribed percent of the gross receipts. Mr. Hill was required to make all other payments associated with the operation of the project. During 1973 Mr. Hill made mortgage interest payments on behalf of Equity St. Petersburg of $145,057.06. Held, such payments constitute rental income and are correspondingly deductible as interest pursuant to sec. 163(a), I.R.C. 1954. *736 In addition, pursuant to the lease, Mr. Hill paid $33,699.96 to the partnership in 1973 and $30,891.63 in 1974. Held further, such payments constitute rental income and not return of partnership basis in the project. The apartment project was not completed by Mr. Hill. After a series of amended completion guarantees, Mr. Hill went into bankruptcy on November 7, 1974.The partnership sued Mr. Hill and the guarantors under the completion guarantee on December 3, 1974, seeking specific performance on the guarantee and performance under the lease. On June 27, 1975 petitioner, as general partner of several partnerships, exchanged in a like-kind exchange, the half interests in apartment projects owned by Equity St. Petersburg and another partnership for half interests in two other projects jointly owned with Hill-related entities by petitioner's partnerships. After such exchange, the properties received by petitioner's partnerships were no longer included in the bankruptcy estate. Held further, Equity St. Petersburg did not abandon the project in 1974 and therefore did not sustain an abandonment loss. The partnership conducted continuing and eventually successful efforts *737 to retrieve value from its investment, and there was no overt act evidencing abandonment. Stephen L. Kadish,J. Timothy Bender and Mark B. Cohn, for the petitioner. Barbara B. McCaskill, *738 for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By notice of deficiency dated September 4, 1980 respondent determined deficiencies in petitioner's Federal income taxes for the taxable years ended December 31, 1973 and December 31, 1974 in the respective amounts of $1,806.28 and $24,428.43. After concessions, the issues remaining for decision are (1) whether Equity St. Petersburg Building Company (hereinafter Equity St. Petersburg), a limited partnership of which petitioner was general partner, is entitled to an interest deduction for amounts allegedly paid on its behalf during 1973 by Tom Hill, or, alternatively, if it is found that Equity St. Petersburg is enitled to such deduction, whether the partnership had additional income equal to the amount so paid; (2) whether Equity St. Petersburg had rental income during the 1973 and 1974 taxable years in the respective amounts of $33,699.96 and $30,891.63; and (3) whether Equity St. Petersburg sustained an abandonment loss in the taxable year 1974 in the amount of $149,852. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts *739 and exhibits attached thereto are incorporated herein by this reference. Petitioner is a corporation incorporated under the laws of the State of Ohio with its principal place of business located in Beachwood, Ohio at the time of filing the petition herein. It filed its Federal corporate income tax returns for the years in question with the Internal Revenue Service Center, Cincinnati, Ohio. Petitioner is in the business of real estate investment, management and development, financial planning and syndication of real estate and other investments, selling insurance, and instituting pension and profit-sharing plans. In 1972, petitioner purchased from Tom Hill an undivided 50-percent interest in an apartment building project known as Buena Vista Phase II (hereinafter Buena Vista II) in Seminole, Florida. Mr. Hill, now deceased, was an individual who controlled several partnerships and corporations which were in the business of real estate development and management. These various enterprises constructed and managed apartment buildings in several states, including Texas, Florida, Arizona, Kentucky and Michigan. Mr. Hill and his corporation, Hill Financial Corporation, retained *740 the remaining undivided one-half interest in Buena Vista II. On the same day that the contract of sale was executed, petitioner leased back to Mr. Hill its undivided one-half interest in the project. In May of 1972, petitioner assigned its rights under the purchase agreement to the limited partnership Equity St. Petersburg and offered to investors limited partnership interests in the Buena Vista II project. [1]
The purchase price for petitioner's one-half interest in Buena Vista II was $540,000 plus one-half of the amount of the permanent mortgage financing to be obtained by Mr. Hill. The purchase agreement provided that the project would be completed by Mr. Hill as contractor for the co-owners on or before February 28, 1973. Mr. Hill was responsible for obtaining financing for the construction of the improvements to be built "having an unpaid principal balance at the time of the completion of such improvements in an amount not in excess of TWO MILLION SEVEN HUNDRED THOUSAND DOLLARS ($2,700,000.00). *741 " The purchase agreement further required Mr. Hill to obtain permanent mortgage financing by February 28, 1974 for a 30-year term at 8-1/2 percent interest. [2]
The purchase agreement and the lease were mutually interdependent and inextricably interwoven. The term of the lease was 25 years. Pursuant thereto, Tom Hill was obligated to pay petitioner as "annual fixed basic rent" the sum of $54,000 "plus the total annual payments required to be made on any mortages placed upon the leased premises for either construction or permanent financing." The amount of mortgage payments due as rent to petitioner was set at one-half "of the total mortgage payments due on mortgages secured by the entire undivided interest" in the land and buildings. [3] In addition, Mr. Hill was obligated to pay petitioner 25 percent of one-half of the gross receipts received during each year by Mr. Hill from the operation of the leased premises to the extent such receipts exceeded $480,690. *742 Mr. Hill additionally was required to make all other payments associated with the operation of the apartment project, including real estate taxes, insurance, etc. [4] Rental payments were to begin upon commencement of the term of the lease, beginning March 1, 1972 and ending February 28, 1997. Payment of the rental amounts specified in the lease was not contingent upon completion of the apartment project and rental of the units to third parties. In order to obtain construction funds in addition to those provided by Equity St. Petersburg for the Buena Vista II project, Mr. Hill obtained a mortgage loan from Great American Mortgage Investors secured by a nonrecourse note. As stated, Mr. Hill was obligated to make all principal and interest payments on such mortgage. Equity St. Petersburg therefore made no direct payments of principal or interest on the mortgage. *743 During 1973, as part of the construction costs of the project, Mr. Hill allegedly made mortgage interest payments of $145,057.06 on behalf of Equity St. Petersburg. In addition, pursuant to the rental terms of the lease, Mr. Hill paid $33,699,96 to the partnership in 1973 and $30,891.63 in 1974. On its 1973 calendar year partnership return, Equity St. Petersburg reduced the partnership's basis in the construction by the amount of the guaranteed rental payments received and did not include such payments in income. It also deducted the mortgage loan interest paid on its behalf by Mr. Hill as an interest deduction without including a like amount in income. On its 1974 partnership return, it likewise treated the rental payments as a return of capital rather than income. [5]
*744 The Buena Vista II apartment building complex was not completed by February 28, 1973 as required in the purchase agreement. On March 28, 1973 Tom Hill, Martin Friedman, Edward Ginsberg and Robert J. Lax (hereinafter the guarantors) issued a completion guarantee to the partnership whereby they guaranteed completion of the project by October 31, 1973. However, the project was not completed by this date. As a result, the guarantors amended the completion guarantee, resetting the guaranteed completion date to March 30, 1974. Again the project was not completed by the date established. Thus, on July 18, 1974 the guarantors executed a second amended completion guarantee, whereby they guaranteed completion of the complex by September 1, 1974. As of the end of 1974, Equity St. Petersburg had no depreciable property because the apartment building complex had not been completed and placed in service. No depreciation deduction was claimed by the partnership for the years 1973 or 1974. On November 7, 1974 Mr. Hill and his related companies (hereinafter the debtors) filed bankruptcy in Dallas, Texas under Chapter XI of the Bankruptcy Act. [6] On December 18, 1974 the debtors filed a *745 Statement of Affairs for Bankrupt Engaged in Business listing $88.7 million in assets and $106.8 million in liabilities. The statement listed the Buena Vista II apartment project as consisting of 206 apartment units under construction with a fair market value of $3.5 million. The statement noted that the project was encumbered with a first lien mortgage, the mortgagee being Great American Mortgage Investors of Atlanta, Georgia (hereinafter GAMI). GAMI was, at the time that the mortgage was given, a real estate investment trust. At the time of the bankruptcy filing, the mortgagee's claim was in the amount of $3,796,616, according to the Statement of Affairs. The guarantors, at the time of the bankruptcy, had issued similar guarantees on other unrelated projects that were affected *746 by the Hill bankruptcy filing and were unable to honor any of their guarantees. As of December 1974, the Buena Vista II project was encumbered by the GAMI claim of $3,796,616 and was not in a state of completion. [7]
At the time of the bankruptcy filing, the Buena Vista II project became subject to the jurisdiction of the Bankruptcy Court. A stay upon the property prevented any possible foreclosure on the project by GAMI until 1976, at which time the stay was lifted. At some unspecified time after the bankruptcy of the guarantors, Equity St. Petersburg began forwarding the bills and statements, received by the partnership with respect to the property, to GAMI. On December 3, 1974 Equity St. Petersburg filed suit in Cleveland against the guarantors with respect to the July 18, 1974 completion agreement. The complaint sought payment by the guarantors of the amounts due and owing under the terms of the lease agreement. It further sought the payment *747 of liquidated damages as specified in the completion guarantee. Finally, Equity St. Petersburg requested the court to compel specific performance of the completion guarantee by the guarantors. [8]
*748 On April 2, 1975 the Form 1065 for Equity St. Petersburg was signed. The return indicated that partnership had taken a loss on abandoned construction. The portion of the return that was sent to the partners, the Forms K-1, only showed each partner's loss; it did not contain an explanation of the loss. The losses shown on the K-1s for 1974 were similar in amount to those shown on the K-1s for 1973. Mr. Myeroff, an officer of petitioner, stated that he informed three of the 36 limited partners of Equity St. Petersburg that the project had been abandoned but that he told them that he "did not close all the doors." Other than this, petitioner did not formally notify the partners that the partnership had abandoned the property. The partnership did not notify the Bankruptcy Court, the debtors, or the mortgage holder, GAMI, that it was abandoning the property. During 1974, Equity St. Petersburg retained legal title to the Buena Vista II project and its rights under the lease. On June 27, 1975 petitioner, as general partner of several partnerships, agreed to an exchange of the half interests in the apartment projects co-owned by Equity St. Petersburg and Equity Fort Worth and Hill-related *749 entities for the remaining half nterests in other apartment building projects co-owned by petitioner's partnerships and Hill-related entities. Under this agreement, the petitioner and the limited partners released the guarantors from all liability. The Bankruptcy Court approved this transaction by order dated July 28, 1975. The exchange of interests in the apartment building projects was a like-kind exchange. After such exchange, the properties that petitioner's partnerships had received in exchange were no longer included in the bankruptcy estate. Thereafter, the following partnerships became partners in another partnership known as Equity Whispering Hills, which held a 100-percent fee interest in the projects known as Country Aire I and Country Aire II: Equity St. Petersburg Building Company Equity St. Petersburg Land Company Equity PetersonLane Building Company
Equity Peterson Lane Land Company Equity Dallas Investment Company Equity Fort Worth Investment Company Equity Country Aire I Equity Country Aire II Equity St. Petersburg received a 23.4-percent interest in the profits and losses of Equity Whispering Hills and a 19.74-percent ownership isnterest in *750 the partnership capital. [9]
On November 26, 1975 the debtors filed a consolidated Plan of Arrangement with the Bankruptcy Court in Dallas. On December 10, 1975 they filed a Second Amended Plan of Arrangement, which was confirmed by the court on December 18, 1975. The plan of arrangement is still in effect today. In his statutory notice, respondent disallowed petitioner's share of the interest deduction in 1973 and the abandonment loss deduction in 1974. Additionally, respondent increased petitioner's distributive share by its share of the rental payments made by Mr. Hill during those two years. OPINION Interest Payment
The lease executed by the parties provided that one-half of the mortgage payments due on mortgages secured by the entire undivided interest in the property would be paid by Mr. Hill on behalf of Equity St. Petersburg in partial satisfaction of his rental obligation to the partnership.
*751 The lease also provided that as long as the promissory note of the lessor to the lessee remained unpaid, the rent due would be abated pro rata for that portion of the purchase price represented by the unpaid portion of the note. Based on a letter received from Hill Consolidated Corporation on February 19, 1974 which stated that $145,057 in interest had been paid on its behalf, petitioner took this amount as an interest deduction pursuant to section 163(a). Correspondingly, petitioner reduced its basis in the apartment project by the amount so paid. Respondent challenges petitioner's treatment of this item on two alternative grounds. First, he alleges that petitioner has failed to substantiate that the interest was in fact paid. Secondly, respondent asserts that the payment by Hill on petitioner's behalf constitutes rental income to petitioner rather than a return of basis. We believe that the disputed interest payment was in fact made in 1973. The payment was made by Hill on petitioner's behalf. Therefore, petitioner's only record of the event was the statement received from Hill Consolidated Corporation. We think this statement, which was issued some 9 months before Mr. *752 Hill and his related entities entered into bankruptcy and which summarized the activities of Hill with respect to Buena Vista II during the prior taxable year, is reliable. Petitioner was not in possession of the cancelled checks or other documents which might have further substantiated the payment but made every reasonable effort to locate such documentation in the haystack of disorganized records left by Hill in the wake of the bankruptcy proceedings. In short, we think that petitioner has done all that it can to substantiate the interest payment and we believe that the fact of such payment is sufficiently supported by the statement received from Hill Consolidated Corporation. [10]
Assuming, as we have found, that the interest payment was made by Mr. Hill, respondent does not question the deductibility by the partnership of such payment. However, he departs from petitioner's treatment of the item by contending that it constitutes rental income to the partnership. *753 Petitioner, on the other hand, asserts that the payment is a return of capital. We agree with respondent. The terms of the lease make it quite clear that the mortgage payments by the lessee on behalf of the partnership were to constitute rent. The provision of the lease calling for pro rata abatement of rent is of no help to petitioner since the interest payment was in fact made and therefore was not abated to that extent. Petitioner apparently asserts that no rent was due until its promissory note was fully paid. This interpretation misconstrues the abatement provision, which simply abates that portion of the rent attributable to the unpaid purchase price.Abated rent is not paid. The mortgage interest was paid. The interest payment was not abated rent. Petitioner's argument that the interest payment on its behalf was in reality a return of capital is grounded on the postulation that Mr. Hill was paying the interest obligation with funds paid by petitioner to purchase its one-half interest in the apartment project. Since the project was never completed by Mr. Hill, and therefore never generated revenues to him, the payments made by him could only have come from the funds *754 received by petitioner to purchase the property. [11] Thus, the payments were simply a return of a portion of that purchase price. Petitioner's argument is creative, tracing by implication as it were. In so arguing, petitioner is attempting to avoid the form of the sale-leaseback transaction entered into with Mr. Hill. Basically, that transaction called for a purchase of the one-half interest by petitioner followed immediately by a leaseback of that interest to Mr. Hill under a net lease. Deductions arising from such transactions have in the past been struck down on the grounds that there was no actual investment by the owner-lessor in the property since *755 the purchase price greatly exceeded the property's fair market value, Narver v. Commissioner,75 T.C. 53, 101 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982), and that the sale-leaseback was not a genuine multi-party transaction with economic substance, Hilton v. Commissioner,74 T.C. 305, 364 (1980), affd. 671 F.2d 316 (9th Cir. 1982), among others.Petitioner, of course, does not contend that the sale-leaseback herein lacked economic substance. It contends that, because Mr. Hill allegedly was paying the interest out of funds invested by petitioner, such payment was in effect a return of capital. The lease provided that the payment of mortgage interest by Mr. Hill on behalf of petitioner was required to satisfy Mr. Hill's rental obligation under the lease.Thus, the lease characterized the interest payments as rent. Where a taxpayer seeks to avoid the form of his own agreement on the ground that such form is at variance with the substance of the transaction, a higher level of proof often is required in order for him to *756 carry his burden. See Lucas v. Commissioner,58 T.C. 1022, 1032 (1972), and cases cited therein. However, whether petitioner must surmount the "strong proof" burden or the usual burden of proof is immaterial since we find that petitioner falls short under either standard. See Bennett v. Commissioner,450 F.2d 959, 960 (6th Cir. 1971), affg. a Memorandum Opinion of this Court.
Of critical importance in our conclusion is the fact that Mr. Hill's rental obligation under the lease was not conditioned upon either his completion of the construction of the apartment complex or the occupancy of rent-paying tenants in the complex. [12] His payment of the interest was made pursuant to the lease terms, and if Mr. Hill had failed to make the payment petitioner would have had a cause of action under the lease to recover the rent due. However, unlike 1974, when Equity St. Petersburg sued to recover amounts due and owing under the terms of the lease agreement, Mr. Hill satisfied his 1973 rental obligation insofar as the mortgage interest payment was concerned. Mr. Hill's ultimate bankruptcy and failure to complete the apartment project does not change the *757 character of the rental payment. See, in this respect, Belz Investment Co. v. Commissioner,72 T.C. 1209, 1231-1232 (1979), affd. 661 F.2d 76 (6th Cir. 1981). Reinforcing our conclusion is the fact that Mr. Hill's mortgage payment on behalf of Equity St. Petersburg in no way reduced that partnership's half interest in Buena Vista II. If petitioner has sought and obtained a return of capital, its half interest in the apartment project would have diminished correspondingly. Nothing of the sort occurred. The facts simply do not support a conclusion that Equity St. Petersburg reduced its investment in Buena Vista II by "selling" a portion of that investment back to Mr. Hill in consideration for the interest payment he made on its behalf. On the contrary, *758 it made a continuous effort to protect that investment by entering into a series of completion agreements that eventually reestablished the guaranteed completion date to September 1, 1974. [13] Mr. Hill's payment of interest on behalf of Equity St. Petersburg fulfilled his rental obligation and did nothing more. The payment constituted rental income of the partnership in 1973 and must be treated accordingly. Rental Payments
The treatment of the direct rental payments of $33,699.96 and $30,891.63 made by Mr. Hill to Equity St. Petersburg during 1973 and 1974, respectively, is governed by the same analysis applicable to the indirect rental payments. Such payments were mandated under the terms of the lease and did not reduce petitioner's one-half interest in the apartment project. Such payments simply satisfied Mr. Hill's rental obligation under the lease. Accordingly, they constitute rental income to petitioner. See, generally, Belz Investment Co. v. Commissioner,supra at 1232. *759 Abandonment Loss
The final issue for decision is whether petitioner is entitled to an abandonment loss deduction on account of the alleged abandonment by Equity St. Petersburg of the Buena Vista II project in 1974.
Section 165(a) authorizes a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." A loss resulting from the abandonment of property is deductible pursuant to section 165(a), see secs. 1.165-2(a) and 1.167(a)-8(a)(4), Income Tax Regs., if the loss is incurred in a trade or business or in a transaction entered into for profit. Sec. 165(c)(1) and (2). Section 1.165-2(a), Income Tax Regs., provides that such loss is deductible in the year sustained, but that "the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or the loss of title to the property, occurs." In order for an abandonment loss to be deductible (1) the owner must intend to abandon the property; (2) the property must have lost its usefulness or value to the *760 owner; and (3) "there must be an overt act of abandonment or identifiable event to evidence the abandonment and fix the loss. Mere nonuse of the property is insufficient." Ford v. United States, an unreported case ( W.D. Ky. 1967, 20 AFTR 2d 5033, 67-2 USTC par. 9546), affd. per curiam 402 F.2d 791 (6th Cir. 1968), relied on by the parties. See also Massey-Ferguson, Inc. v. Commissioner,59 T.C. 220, 225 (1972). The analysis must be based on the surrounding facts and circumstances. Massey-Ferguson, Inc. v. Commissioner,supra at 225. After a careful review of the record and pertinent case law, we find that petitioner is not entitled to the claimed abandonment loss for 1974. Our conclusion primarily is based upon the partnership's continuing and eventually successful efforts to retrieve value from its investment and upon the absence of an overt act performed by the partnership evidencing abandonment. We believe that Equity St. Petersburg's suit, instituted on December 3, 1974, belies the contention that the partnership intended to abandon the project during 1974. In that action, Equity St. Petersburg sought *761 enforcement of the lease agreement, liquidated damages pursuant to the completion guarantee, and specific performance of such guarantee. The partnership showed every indication that it was sincere in its efforts to obtain relief. During discovery, it attempted to obtain the financial records of the guarantors. In support thereof, it filed a memorandum stating that the financial condition of the guarantors was of "paramount concern" because of the claim for specific performance. In addition, Equity St. Petersburg filed memoranda in opposition to a motion to dismiss with respect to Mr. Hill and a motion for a more definite statement. The discovery process was called to an official halt by the court's dismissal of the case on September 12, 1975. However, the pleadings bespeak an earnest effort by Equity St. Petersburg to compel the guarantors to complete construction of the project well into the 1975 taxable year. Petitioner attempts to discount the significance of these acts by maintaining that the suit was brought solely to appease the limited partners of Equity St. Petersburg and not with any real expectation that the requested relief would be granted. In its brief, petitioner *762 declares that the-- suit against the Guarantors was instituted because it was felt by the attorneys for Equity that filing the suit was necessary to preclude claims by investors that Equity had breached its fiduciary duty as a general partner by not pursuing every avenue available to it for recovery. * * * By filing suit when there was no subjective or objective hope of collecting, Equity was primarily protecting itself against future suits against it by investors.
We disagree. First of all, the extensive discovery efforts undertaken by Equity St. Petersburg reflect much more than an empty gesture made to quell dissention among investors. Secondly, it would seem that the expenditure of funds of the partnership to engage in a lawsuit in which it was believed that there was no reasonable hope of recovery comes closer to a breach of the general partner's fiduciary duly than the failure to expend such funds in pursuit of an impossible remedy. We would prefer to conclude that there was substance to the lawsuit rather than that petitioner squandered partnership funds in an excess of caution. Be that as it may, petitioner insists that the filing of the suit against the guarantors *763 was a separate and distinct act independent of the abandonment of the project, that such suit did not constitute an effort to retain the project. Again, we disagree. The partnership's interest in the project was, during the period of the 25-year lease, derived almost exclusively from the lease. The prayer for relief in the suit against the guarantors sought enforcement of the lease agreement. Additionally, and perhaps more persuasively, the partnership sought specific performance of the completion guarantee. Such remedy could benefit Equity St. Petersburg only if it retained its interest in Buena Vista II. During discovery, the partnership made a determined effort to obtain the financial records of the guarantors on the ground that such information was relevant to the question of whether they could perform on the completion guarantees. The memorandum supporting this quest and in opposition to the guarantors' motion for a protective order was filed on February 20, 1975. If petitioner was so certain during the latter part of 1974 that the guarantors could not possibly fulfill their obligations under the lease and the completion agreement, we wonder why it was so curious about *764 the financial status of the guarantors as late as February of 1975. The answer lies in the memorandum. Petitioner still thought that the project could be completed. The suit against the guarantors was not a collateral suit independent of the question of abandonment but rather was an unequivocal act of retention. A necessary condition of an abandonment loss deduction is that the owner must intend to abandon the property. [14] The partnership's continuing efforts to enforce the lease and completion areements negates the existence of such intent. Our finding that Equity St. Petersburg did not abandon Buena Vista II during 1974 is further buttressed by its subsequent disposition of that project. On June 27, 1975 petitioner, as general partner of several partnerships, agreed *765 to an exchange of the half interests in the apartment projects co-owned by Equity St. Petersburg and Equity Fort Worth and Hill-related entities for the remaining half interests in other apartment building projects co-owned by petitioner's partnerships and Hill-related entities. As part of this like-kind exchange, petitioner and the limited partners of Equity St. Petersburg released the guarantors from all liability, while the properties of which petitioner's partnerships received the remaining half interests were excluded from the bankruptcy estate. Equity St. Petersburg then became a partner in Equity Whispering Hills, receiving a 23.4-percent interest in the partnership profits and losses, and a 19.74-percent ownership interest in the partnership capital. Petitioner's transfer of Buena Vista II in 1975 is inconsistent with its contention that such project was abandoned in 1974. [15] This is not a case where a subsequent sale was for salvage value or for such a miniscule amount that the proceeds are not inconsistent with worthlessness in a prior year. See, e.g., Rhodes v. Commissioner,100 F.2d 966, 970 (6th Cir. 1939), revg. 34 B.T.A. 212 (1936). *766 Here, the partners of Equity St. Petersburg received substantial value in return for their half interest in Buena Vista II, a fact which demonstrates that the project was of substantial value to those partners. A subsequent sale by the owner of property that allegedly had been abandoned previously by him is a factor supporting a finding that there was no abandonment when such sale or exchange is in return for something more than salvage value. Accord, Talache Mines v. United States,218 F.2d 491, 498 (9th Cir. 1954); In Re Rae's Estate,147 F.2d 204, 206 (3d Cir. 1945), affg. a Memorandum Opinion of this Court; United California Bank v. Commissioner,41 T.C. 437, 456-457 (1964), affd. per curiam 340 F.2d 320 (9th Cir. 1965). [16]
*767 Petitioner would have us believe that the partners of Equity St. Petersburg surrendered property of negligible value in exchange for the share they received in the Equity Whispering Hills project. Such an exchange would have been to the detriment of the limited partners of the other participating partnerships since the old Equity St. Petersburg partners would have been cut in on a share of the newly formed partnership at no cost. We choose to believe that the deal was not a gift from the partners of more stable partnerships to the partners of Equity St. Petersburg, but that value was given for value received. Petitioner has failed to prove the existence in 1974 of an overt act of abandonment or an identifiable event evidencing the alleged abandonment and fixing the loss. Petitioner contends that the overt act requirement was satisfied by its forwarding of bills and statements of the project to GAMI. However, petitioner has failed to prove such documents were forwarded prior to 1975. Furthermore, even if petitioner could establish that the bills and statements were forwarded to GAMI beginning in December 1974, we do not believe that such act constitutes an overt act of abandonment *768 since petitioner, lessor under a net lease, was not responsible for payment of the bills of the Buena Vista II project. Petitioner also claims that because its representative visited the premises and ascertained that the project had been deserted by the contractor-lessee and that none of the 206 suites under construction had been completed, it performed an overt act probative of abandonment. While such visit to the apartment project might have led petitioner to the conclusion that all work had been halted with respect to the project for the immediate future, we do not believe that this observation represents an overt act of abandonment. First of all, Equity St. Petersburg's suit for specific performance indicates that it entertained the hope that, despite the work stoppage, the construction project could be completed. Secondly, petitioner's only control over the project was that authorized under the sales contract and lease agreement. Since the lease agreement entered into between Mr. Hill and Equity St. Petersburg was a net lease, petitioner's inspection of the premises did not amount to a physical act indicative of abandonment. [17]
*769 Petitioner also maintains that its representative made statements to several of the partners in the limited partnership that the premises were being abandoned during 1974.In addition to possible hearsay problems existing with respect to such testimony, we do not think that the statements were sufficient to constitute an overt act. First of all, Mr. Myeroff stated that he only told three partners that the Buena Vista II project was to be abandoned. Secondly, Mr. Myeroff's statements were highly ambiguous, for, although he stated that the project was being abandoned, he also stated that he had hopes that something could be made of it. Such conditional statements to a small minority of the limited partners do not constitute overt acts of abandonment. More telling in this respect is petitioner's failure to notify formally all of the limited partners of Equity St. Petersburg that the sole income-generating asset of the partnership had been abandoned. Petitioner's representatives' testimony with respect to the value of the apartment project and its potential value if completed is entitled to little weight since it was based upon cursory investigation of the premises and since such representatives *770 were not established as being experts in real estate valuation. Petitioner apparently made no effort to obtain an appraisal of the value of Buena Vista II. See Ticket Office Equipment Co. v. Commissioner,20 T.C. 272, 276, 278 (1953), affd. per curiam 213 F.2d 318 (2d Cir. 1954). [18] Secondly, we believe that petitioner's suit for performance under the lease and specific performance by the guarantors suggest that the apartment project was not so heavily encumbered that it could not become a viable venture upon completion. Finally and perhaps most significantly, the fact that the partners of Equity St. Petersburg received substantial value in a like-kind exchange in July of 1975 indicates that their half interest in the Buena Vista II project also had substantial value at this time. Taken together, these several factors lead us to the conclusion that petitioner's self-serving and unsupported estimate of the fair market value of the apartment project is entirely too low.In short, we do not believe that the project was worthless in 1974. [19]
*771 We are unable to find an overt act of abandonment by petitioner during 1974. Of course, the mere fact that the partnership claimed an abandonment loss on its tax return for 1974 is not sufficient to constitute an overt act. [20] The partnership returns mailed to the individual limited partners of Equity St. Petersburg did not indicate that an abandonment loss had been taken. Moreover, petitioner did not formally notify the Bankruptcy Court, the debtors, or the mortgage holder, in addition to the limited partners, of the alleged abandonment. As we have stated, petitioner bears the burden of proving its entitlement of an abandonment loss. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioner has proven neither an intent to abandon nor an over act of abandonment during 1974. Accordingly, it is not entitled to the claimed abandonment loss deduction for that year. To reflect the foregoing, Decision will be entered under *772 Rule 155.
Footnotes
1. Subscriptions to the partnership were completed in August of 1972 and the partnership was registered with the Division of Securities of the State of Ohio on November 22, 1972.↩
2. It was further agreed that the price of improvements was not to exceed $3,780,000 and that, upon completion, Mr. Hill guaranteed that the project would be subject only to the mortgage in an amount not more than $2,700,000.↩
3. To the extent that petitioner failed to pay off the promissory note given to Mr. Hill, the rent due under this provision was to be abated pro rata. ↩
4. Equity St. Petersburg was not obligated to, and in fact did not, make directly any of the mortgage payments on the property, nor did it directly pay any real estate taxes or any other expenses associated with the property.↩
5. Petitioner was also the general partner in at least two other partnerships set up to co-own apartment building complexes with Tom Hill or related entities. Such partnerships included Equity Dallas Investment Company (hereinafter Equity Dallas) and Equity PetersonLane Building Company (hereinafter Equity Peterson). Equity Dallas and Equity Peterson entered into substantially identical leases with Mr. Hill as did petitioner. Both partnerships treated guaranteed rents received from Mr. Hill as rental income. Additionally, both partnerships treated one-half of the mortgage payments made by Mr. Hill as rental income. However, the other two partnerships owned projects that had been completed and were substantially occupied at the time of such receipt.↩
6. The related entities which went into the Chapter XI proceedings were Hill Properties, Hill Financial Corporation, Hilco Saginaw Corporation, Hilco Seminole Corporation, Hill Real Estate Investments, Inc., Hilco Tampa Corporation and GFL Corporation, Consolidated, Hilco Management Corporation, Hill Consolidated Corporation, Hill Realty Mortgages Corporation, and Hilco Construction Corporation.↩
7. Mr. Richard Reinberg, president of petitioner, approached representatives of GAMI in an effort to have the debt restructured and to obtain additional financing so that the project could be completed. His request was denied.↩
8. In the course of such proceeding, Equity St. Petersburg attempted to depose Richard Phillips, the custodian appointed by the guarantors to keep information concerning the financial condition of the guarantors, and also to obtain all documents and records pertaining to the financial status of the guarantors. These attempts were opposed by the guarantors by way of a Motion fo Protective Order on the ground that their financial condition was not within the scope of discovery since it was not relevant to the substantive issues to be decided. Equity St. Petersburg then filed a Memorandum and Affidavit in Opposition to the guarantors' motion. In such memorandum, the partnership contended that the financial status of the guarantors was relevant since the partnership sought specific performance on the guarantee. The memorandum stated that "the ability of the defendants to perform in accordance with their contract of guaranty was at the inception, and is now, of paramount concern. Thus, it is highly relevant to the specific performance branch of plaintiff's claim to discover whether the defendants can perform under that contract." The Memorandum and Affidavit were filed with the Cuyahoga County Clerk of Courts on Feb. 20, 1975. On Jan. 27, 1975 Mr. Hill filed a Motion to Quash Service of Process or, in the Alternative, to Dismiss. In response Equity St. Petersburg filed a 9-page memorandum in opposition to this motion. Equity St. Petersburg also filed a Memorandum in Opposition to the guarantor's joint motion for a more definite statement during the discovery phase of the proceeding. By order dated July 17, 1975 a Motion of Separate Defendant Tom Hill for Stay of Proceedings was granted due to the bankruptcy proceeding. On September 12, 1975, the action with respect to defendants Martin Friedman, Edward Ginsberg, and Robert J. Lax was settled and dismissed with prejudice as to the defendants.↩
9. In 1978 Equity Whispering Hills filed its first partnership return, Form 1065, for the taxable year ended Dec. 31, 1977. On that return, it reported $859,489.53 in rental income, $143,843.59 in depreciation, $17,959.34 in repairs, and $877,674.32 in other expenses.↩
10. The statement received from Hill Consolidated Corporation is admissible under the business records exception to the hearsay rule. See United States v. Flom,558 F.2d 1179, 1183↩ (5th Cir. 1977).
11. Petitioner makes no pretense of being able to trace, in fact, the exact funds it paid to Mr. Hill.Hill and his related entities were involved in a number of projects and there is no assurance that funds were not transferred at will between them. However, petitioner does maintain that the end result is the same, that if the purchase money was used for some other purpose, it was replaced by the money used to satisfy the interest obligation. In short, it contends that because cash is fungible, tracing is not necessary.↩
12. Even had the apartment project been timely completed by Mr. Hill on February 28, 1973, there was no assurance that Mr. Hill's leasing of individual units in that project would have generated sufficient rental revenues to cover the entirety of Mr. Hill's rental obligation to petitioner. However, this would not have transformed the character of such obligation to something other than rent.↩
13. We note that the partnership still owned a one-half interest in Buena Vista II at the time of its exchange of that interest in July of 1975 for half interests in other partnerships.↩
14. In this respect, among others, this case is distinguishable from the cases cited by petitioner involving deductions for an embezzlement loss, Mann v. Commissioner,T.C. Memo. 1981-684, and for a worthless security, Sailer v. Commissioner,↩ a Memorandum Opinion of this Court dated May 20, 1948.
15. In this respect this case is distinguishable from Tanforan Co. v. United States, an unreported case ( N.D. Cal. 1970, 26 AFTR 2d 70-5603, 70-1 USTC par. 9452), affd. 462 F. 605↩ (9th Cir. 1972), cited by petitioner, since in that case the property for which an abandonment loss deduction was taken (racetrack) was not the property subsequently sold (underlying realty). 16. See also Golden Gate Disposal Co. v. Commissioner,T.C. Memo. 1979-199, affd. without published opinion 642 F.2d 455 (9th Cir. 1981); Finley v. Commissioner,T.C. Memo. 1974-229; Miners Broadcasting Service, Inc. v. Commissioner,T.C. Memo. 1964-266; Diamond Alkali Co. v. Commissioner,↩ a Memorandum Opinion of this Court dated Jan. 29, 1954.
17. In this respect, the guidelines for establishing the abandonment of a building as set out in Hanover v. Commissioner,T.C. Memo. 1979-332, are inapplicable. Unlike, Hanover, the instant case involves a net lease whereunder petitioner was not responsible for the maintenance of the property. Abandonment by the lessor in a net lease setting is a special situation requiring some additional affirmative act by the passive lessor beyond the actions of the lessee. Mere nonuse is not enough. Golden Gate Disposal Co. v. Commissioner,supra.↩
18. Additionally, petitioner's estimate of the fair market value of the project is undermined by the $3.5 million value assigned to that project in the bankruptcy petition. We are aware that this value is somewhat of an estimate. However, no plausible explanation was given for the huge disparity between the $3.5 million value listed on the bankruptcy petition and the much lesser value proffered by petitioner. ↩
19. Petitioner has not argued that it is entitled to an abandonment loss deduction under the doctrine of "practical abandonment." In such case, it must be shown that the property in question was valueless to the owner during the year for which the abandonment loss deduction is claimed. See Gordon v. Commissioner,46 B.T.A. 1201, 1210 (1942), affd. 134 F.2d 685↩ (4th Cir. 1943). Here, because of the suit for specific performance and because of the fact that petitioner and the limited partners of Equity St. Petersburg were subsequently able to obtain substantial value for their half interest in the apartment project, we do not believe that such interest was without value in 1974.
20. Blair v. Commissioner,↩ a Memorandum Opinion of this Court dated Aug. 20, 1946.