**IRBY CONSTRUCTION COMPANY**

v.

**UNITED STATES.**

No. 412–57.

United States Court of Claims.
June 7, 1961.

Charles T. Akre, Washington, D. C., Miller & Chevalier, Clarence T. Kipps, Jr., Washington, D. C., and R. L. Stainton, Jackson, Miss., on the brief, for plaintiff.

Earl L. Huntington, Washington, D. C., with whom was Louis F. Oberdorfer, Asst. Atty. Gen., James P. Garland, Lyle M. Turner, and George T. Qualley, Washington, D. C., on the brief, for defendant.

JONES, Chief Judge.

Plaintiff is a small, family-owned corporation. In 1953 and 1954, the plaintiff paid some $300,000 in compensation to its managing executives. For Federal income tax purposes it deducted this amount from gross income as an ordinary and necessary expense of carrying on the business. The Commissioner of Internal Revenue disallowed the deductions as being unreasonable allowances for personal service compensation and assessed deficiencies for both years. The plaintiff paid the additional assessment under protest and now sues for a refund of such payments.

The facts have been set out in detail in the findings and we shall restate them only briefly. The Irby Construction

Company was almost altogether a service organization. It was incorporated in 1946 and had as its main purpose the erection of power distribution and transmission lines. At this time such construction had already acquired the specialized name of pole line construction to distinguish its unique place in the construction industry. For several years the United States Rural Electrification Administration had been encouraging pole line construction and between 1946 and 1948 construction projects were plentiful. By 1950 the volume of work available had declined and the keen competition steadily thinned the ranks of those in the pole line construction business. The plaintiff was outstanding among the surviving companies due almost entirely to the competence and integrity of its managing executive, Stuart C. Irby, Senior (whom we shall call hereafter Irby Senior). Business did not long stay depressed. In 1951 the Rural Telephone Administration was established under the aegis of the REA to promote the extension of rural telephone lines and service. When the plaintiff undertook and successfully performed the first RTA contracts in the southern area it took a lead in the industry it was not soon to surrender.

But as eternal vigilance is the price of liberty, so too has it been the price of success in the pole line construction business. Each project had to be won by competitive bid and completed under circumstances which usually required stringent economies if profits were to result. In contrast to ordinary manufacturing businesses, there were no established markets for the exchange of goods, and profits did not flow to construction companies simply as a result of routine manufacturing and sales procedures. Established lines of credit and a top reputation were essential assets to a construction business but they alone could not guarantee continuity either of business or profits. Responsible management remained the key to the success of a pole line business, and managerial responsibility was almost always placed on one man in each business. It was the job of this managing executive to prepare winning bids and then to supervise the efficient and profitable performance of the contract. He was the indispensable heart of the business and his importance was universally recognized and rewarded with high salaries.

From 1946 to 1952 Irby Senior was the plaintiff's managing executive. Stuart C. Irby, Junior (hereinafter designated Irby Junior) joined the plaintiff in 1948, and under the guiding hand of his father rapidly assimilated the skills required for successful operation. By the end of 1951, Irby Junior had proved his ability and during 1952 he was virtually in control of the business. In 1952 Irby Junior's salary had increased to $21,000.

It must be understood that during the period in question ownership of the plaintiff corporation was maintained to a high degree by the Irby family. Shares owned by Irby Senior, his son and daughter and his grandchildren accounted for more than 70 percent of the shares outstanding. Irby Senior had the highest share personally, 37.4 percent in 1953 and 34.6 percent in 1954. Irby Junior, second only to his father, owned 25.7 percent in 1953 and 30.8 percent in 1954.

At the end of 1952, Irby Junior suggested a compensation plan whereby certain employees of the corporation who were not members of the Irby family would be permitted a share in the profits of the corporation in addition to salary. Also, Irby Junior suggested a plan whereby he would receive a calculated share of the profits in lieu of salary. The plans were agreed upon between father and son, and were formally adopted by the company's board of directors. The agreements, adopted in February 1953, were in effect for 1953 and 1954. The compensation arrangement called for setting aside from each year's profits either $30,000 or 6 percent of the company's net worth, whichever was greater, before any compensation would be payable to Irby, Junior. Profits in excess of this quota would be divided, 60 percent to Irby Junior, and 40 percent to the corporation, provided that such division would only be

applicable to the time Irby Junior was actively engaged in the business. The proviso was inserted because of the contemplated absence of Irby Junior during parts of 1953 and 1954. During the absence of Irby Junior, the board of directors made the compensation scheme applicable to Irby Senior because he resumed active management of the business for this time.

The corporation achieved record success during the period in question and compensation to the two Irbys was as follows:

|  | 1953 | 1954 |
|---|---|---|
| Irby Senior ... | $25,000.00 | $ 84,416.25 |
| Irby Junior ... | 70,727.19 | 126,110.14 |

The Commissioner of Internal Revenue allowed the plaintiff to deduct $50,000 in 1953, and the same amount in 1954 based on a maximum reasonable compensation of $25,000 per year for each of the Irbys. Some $200,000 which the plaintiff actually paid to the Irbys was disallowed as an unreasonable deduction for salary expense. The plaintiff paid the additional assessments resulting from this disallowance and now sues for their refund.

The statutes applicable to the controversy are as follows:

"§ 23. Deductions from gross income.

"In computing net income there shall be allowed as deductions:

"(a) Expenses.

"(1) Trade or business expenses.

"(A) In general.

"All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a *reasonable allowance* for salaries or other compensation for personal services actually rendered; * * *." [Emphasis supplied.] 26 U.S.C. (I.R.C.1939) § 23 (1952 Ed.).

The language of the parallel provisions of the 1954 Internal Revenue Code is very similar. 26 U.S.C. (I.R.C.1954) § 162 (1952 Ed.Supp. II).

■ There is no definite formula by which the question of the reasonableness of compensation in any particular instance can be determined. It is a question of fact which must be resolved anew in each case. Stiening v. Commissioner, 3 Cir., 1945, 147 F.2d 204. Yet no one fact can be considered controlling to the exclusion of all others. Ticket Office Equipment Co. v. Commissioner, 1953, 20 T.C. 272, affirmed 2 Cir., 1954, 213 F.2d 318. Each situation must be examined as a whole. The issue most often arises, as it does here, in a case concerning a close corporation, where the employees are also stockholders or members of a family controlling the corporation. It is readily apparent that in this situation the question of reasonableness of compensation is inseparably tied to the question of whether the alleged compensation is not really a dividend in disguise.

The inquiry as to the reasonableness of compensation in a given instance is not without some guides. At various times courts have looked to such things as the amounts paid by similar enterprises for services of a like character; the type and extent of services rendered by the employee; the scarcity of qualified employees for the position; the prior earning capacity of the employee; the peculiar characteristics of the taxpayer's business, and the general economic conditions of the period. See Mertens, Law of Federal Income Taxation, Sec. 25.69 (1960). Evidence on each of these points is in the record. But even with these fragments of information in our possession there is no jig available that readily assembles the answer.

The plaintiff urges us to give great weight to the fact that various companies, particularly partnerships, in competition with the plaintiff paid salaries to their managing executives in amounts up to 50 percent of the profits. The average amount of compensation appears to have ranged from 40 to 50 percent of the profits in similar instances. It is uncertain to what extent the share of a partner in the profits of a partnership may be compared to the salary of a cor-

poration employee who is also a large stockholder in the corporation. But in any event, the record shows no company which paid compensation of 60 percent of the profits to a partner or an employee as was done by the plaintiff in the in- itant case. The plaintiff maintains that this high percentage is justified because of the additional risks accepted by the Irbys. Under the terms of the agree- ment the Irbys received no salary until the corporation had earned $30,000, and even when that point was reached the Irbys were guaranteed no minimum salary.

The fact that the aggregate amount of compensation is based upon a contingency is an element tending to show reasonableness, James J. McHale Co. v. United States, D.C.N.D.Ohio 1957, 151 F.Supp. 115; but since the percent- age arrangement of determining compen- sation readily lends itself to a means of distributing or sharing profits it must be tested with that possibility in mind. Consolidated Apparel Co. v. Commission- er, 1952, 17 T.C. 1570, affirmed on this point, 7 Cir., 1952, 207 F.2d 580. Even a payment that is reasonable is not de- ductible if it was actually a distribution of earnings as contrasted with compen- sation for services rendered. Klamath Medical Service Bureau v. Commissioner, 1957, 29 T.C. 339, affirmed 9 Cir., 1958, 261 F.2d 842. Furthermore, a bonus- type contract which is reasonable with a nonstockholder employee may be unrea- sonable if made with a large stockholder since the incentive of the bonus would presumably not be needed to call forth the stockholder's best efforts. City Chevrolet Co. v. Commissioner, 4 Cir., 1956, 228 F.2d 894.

We have weighed all the elements which bear on this controversy, and we conclude that the maximum reasonable compensation which the plaintiff might have paid its managing executive for the years in question and deducted for in- come tax purposes is as follows:

|  | 1953 | 1954 |
|---|---|---|
| Irby Senior | $25,000 | $55,200 |
| Irby Junior | 47,200 | 75,000 |

The plaintiff is entitled to recover, with interest as provided by law, and judg- ment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c), 28 U.S.C.

It is so ordered.

DURFEE, LARAMORE, MADDEN, and WHITAKER, JJ., concur.