Craigs Drug Store, Inc. v. Commissioner.
Craigs Drug Store, Inc. v. Commissioner
Docket No. 3056-68.
United States Tax Court
T.C. Memo 1969-208; 1969 Tax Ct. Memo LEXIS 87; 28 T.C.M. (CCH) 1104; T.C.M. (RIA) 69208; October 8, 1969. Filed Vernon E. Robbins, for the petitioner. Gerald D. Babbitt, for the respondent. TANNENWALD
Memordandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined a deficiency of $2,626.60 in petitioner's Federal income tax for its taxable year ending December 31, 1965. The only issue is whether petitioner paid its president excessive compensation. Findings of Fact Some of the facts have been stipulated and are so found. Petitioner's principal, and only, place of *88 business was Cambridge, Maryland, at the time the petition herein was filed. Petitioner filed its accrual basis Federal income tax return for the calendar year 1965 with the 1105 district director of internal revenue at Baltimore, Maryland. The petitioner's business has always been that of a retail drugstore. From 1933 until 1958, the business was operated as a sole proprietorship by Earl Webster (hereinafter "Webster") doing business as "Craigs Drug Store." Until 1950, Webster was the only pharmacist at the store on a regular basis. In that year, Webster hired Charles Kelly (hereinafter "Kelly") to work as a full-time pharmacist, and two years later he hired Clarendon Gould (hereinafter "Gould"), also as a full-time pharmacist. During 1954 through 1957, Gould and Kelly received the following salaries: Year
Gould
Kelly
1954
$7,110.00
$7,110.00
1955
7,655.00
7,655.00
1956
8,072.00
7,934.00
1957
8,299.00
8,422.00
During the same years, Webster's net profit from the business was as follows: Year
Net profit
1954
$41,623.53
1955
45,454.72
1956
51,618.40
1957
55,693.34
On January 1, 1958, petitioner was incorporated *89 to take over and operate the business. Webster transferred the assets of the proprietorship with a book value of $50,000 to petitioner in exchange for all of its stock. On the same day, petitioner, Webster, Kelly, and Gould executed a written agreement, which provided that Webster was to receive a weekly salary of $300 and Kelly and Gould $160 each. It further provided - That in addition to the weekly salaries hereinafter provided the said employees shall receive as a bonus for their services 90% of the net profits of the Corporation, payable quarterly, in cash, within 30 days after the close of each calendar quarter, said portion of the profits to be divided between them as follows: S. Earl Webster, 60%, Charles W. Kelly, 20%, and Clarendon L. Gould, 20%. It was also provided that Kelly and Gould would use half of the cash bonuses to purchase stock from Webster at book value until each owned 20 percent of the outstanding stock and that, if Webster died, Kelly and Gould were to have the option to purchase the remaining stock at book value. They had a similar option to purchase any stock Webster might wish to sell during his lifetime. Webster in turn agreed to purchase stock Webster *90 might wish to sell during his lifetime. Webster in turn agreed to purchase at book value any stock which Kelly or Gould owned at such time as they were no longer employed by petitioner. By 1965, Kelly and Gould had each acquired 20 percent of the stock; Webster owned the remaining 60 percent. During 1965, Webster was the president of petitioner, Gould was vice president, and Kelly was secretary-treasurer. At all relevant times, petitioner sold at retail prescription drugs, patent medicines, cosmetics, camera supplies, magazines, and other miscellaneous items; it did not sell tobacco products nor maintain any lunch counter or other form of food service. In 1965, it deserved more than half of its gross receipts from the sale of prescription drugs, handled primarily by Gould, Kelly, and a third full-time pharmacist. During 1965, petitioner employed, aside from its officers, approximately eight persons, some full-time and some part-time, including one pharmacist, two delivery boys, and approximately five salesgirls. Webster at all times was the principal operating officer of petitioner. He made all significant business decisions, which involved generally only the hiring and firing *91 of employees and which products to carry, and, in one instance, the installation of a new floor. Only occasionally did he participate in daily sales operations by waiting on customers and filling prescriptions. Most of his time was occupied with clerical tasks such as billing customers, paying bills, preparing W-2 forms and sales tax returns, and paying employees. He handled the bookkeeping, but quarterly financial statements and income tax returns of the petitioner were prepared by petitioner's accountants. During 1965, petitioner's business hours were from 8:00 a.m. to 10:00 p.m., except on Sunday, when they were from 9:30 a.m. to 12:30 p.m. and then from 6:00 p.m. to 9:00 p.m. During 1965, Webster normally worked five days a week and eight hours per day, with a two-week vacation. Petitioner paid Webster, Gould, and Kelly the following amounts in the form of salary and bonus: Year
Webster
Gould
Kelly
1958
$33,932.33
$14,299.80
$ 14,276.80
1959
39,701.79
16,628.92
16,628.92
1960
42,704.27
17,529.75
17,529.75
1961
45,843.25
18,66 6.09
18,636.09
1962
47,900.61
19,256.85
19,256.85
1963
45,715.73
18,478.59
18,908.57
1964
52,855.65
20,955.22
20,945.22
1965
47,939.10
19,561.70
19,579.70
1966
37,197.38
15,949.13
15,949.13
*92 1106 Webster died in March of 1967. Petitioner paid no dividends during the years 1958 through 1964. In 1965, petitioner paid a total dividend of $1,000, shortly after respondent's agents completed an audit of several of its tax returns. The following schedule reflects petitioner's gross sales and net profit (after all bonuses and before income taxes): Year
Gross sales
Net profit
1958
$276,857.39
$3,091.81
1959
298,789.15
4,265.13
1960
321,125.99
4,740.56
1961
333,214.94
5,319.1 9
1962
357,645.90
5,686.39
1963
371,715.33
5,196.47
1964
401,114.67
6,529.97
1965
388,293.84
5,629.84
1966
366,669.48
3,824.54
Opinion We are confronted with the purely factual issue whether, under all the circumstances, the aggregate salary and bonus paid by petitioner to its president and major stockholder in 1965 exceeds "a reasonable allowance for salaries or other compensation for personal services actually rendered" under section 162(a)(1) of the 1954 Code. E.g., Huckins Tool and Die, Inc. v. Commissioner, 289 F. 2d 549, 552 (C.A. 7, 1961), affirming a Memorandum Opinion of this Court; see 4A Mertens, Law of Federal Income *93 Taxation (1966 ed.), secs. 25.68-25.81. Respondent has allowed $36,000.00 out of the $47,939.10 paid Webster in that year. In our findings of fact, we have set forth in as much detail as the record permits the nature of petitioner's business and Webster's activities in relation thereto and we see no need to reiterate them here. Rather, we will deal with the various strands of petitioner's argument. In the first place, petitioner emphasizes that its record of nonpayment of dividends and the fact that the payments were made to Webster, Kelly, and Gould in proportion to their stockholdings are not controlling. With this we agree. But petitioner's accent on the negative cannot be equated with proof of the positive which it is its burden to sustain. Botany Worsted Mills v. United States, 278 U.S. 282 (1929). Moreover, these elements at the very least justify close scrutiny. E.g., Heil Beauty Supplies v. Commissioner, 199 F. 2d 193, 194 (C.A. 8, 1952), affirming a Memorandum Opinion of this Court; Coe Laboratories, Inc., 34 T.C. 549, 586 (1960). Nor are we impressed with petitioner's argument that the payments were made pursuant to contract. *94 We recognize that the mere fact that compensation is contingent is not fatal to its deductibility. Streckfus Steamers, Inc., 19 T.C. 1 (1952); section 1.162-7(b)(2), Income Tax Regs. And, had there been other stockholders who received either no bonus or bonuses which were disproportionate to their stockholdings, petitioner's argument might have more merit. California Vegetable Concentrates, Inc., 10 T.C. 1158 (1948). But where the contractual arrangement is between employees who are also the controlling, and, in this case, the sole stockholders, the argument is far from persuasive. City Chevrolet Company v. Commissioner, 228 F. 2d 894 (C.A. 4, 1956), affirming per curiam a Memorandum Opinion of this Court; Irby Construction Company v. United States, 290 F. 2d 824, 827 (Ct. Cl., 1961); Consolidated Apparel Co., 17 T.C. 1570, 1579 (1952), affirmed on this issue, 207 F. 2d 580 (C.A. 7, 1953). Certainly, neither Kelly nor Gould, who were only employees at the outset, was in any position to object to the amount which Webster, as the sole stockholder and "boss," wanted to take, particularly *95 since they were being accorded the same proportional "cut" in the profits. Nor are we persuaded by petitioner's assertion that Webster was a hard worker and put in long hours. In the first place, by the taxable year 1965, the factual basis for this assertion is doubtful - Webster normally worked a 40-hour, five-day week. And, in any event, although hard work is indeed a traditional manifestation of the American way of life, it is not - even in our affluent society - an open-ended justification of any and all payments for such work as reasonable compensation for tax purposes. Nor did petitioner's business require much management; the bulk of Webster's time was spent on essentially clerical tasks. We further note that petitioner introduced no evidence whatever on compensation paid to persons performing a comparable role in the management of drugstores or other small businesses. It is apparent to us that the agreement, which was purportedly for the payment of 1107 compensation, was in fact a mechanism for the distribution of profits, at least in part. Huckins Tool and Die, Inc. v. Commissioner, supra. Ninety percent of the profits of the business - an unusually *96 large percentage - were siphoned off in the form of bonuses to employees who were also stockholders. The bonuses were paid in proportion to stockholdings and represented a very large proportion of the total amount paid ostensibly as compensation (two-thirds in the case of the amount paid to Webster in 1965). On its face, the agreement was basically a buy-sell arrangement with the additional objective of putting funds in the hands of Kelly and Gould in order to enable them to buy stock. On the basis of the record as a whole, we conclude that petitioner has failed to prove that respondent's substantial allowance is incorrect. Decision will be entered for the respondent.