Verne BUHLER, et al.,
Plaintiffs-Appellants,

v.

AUDIO LEASING CORP., a New Hampshire corporation, etc., et al., Defendants,

Anchor National Financial Services, Inc., a Delaware corporation, Defendant-Appellee.

Norma J. CLEVELAND, et al., Plaintiffs-Appellants,

v.

JERDEN INDUSTRIES, INC., a Washington corporation, et al., Defendants,

Anchor National Financial Services, Inc., a Delaware corporation, Defendant-Appellee.

Nos. 85–4094, 85–4366.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 4, 1986.

Decided Jan. 6, 1987.

As Amended Jan. 13, 1987.

**834**

Judith L. Neustadter, Gary M. Berne, Stoll & Stoll, P.C., Portland, Or., for plaintiffs-appellants.

Jeffrey B. Wihtol, Cooney, Crew & Wihtol, Portland, Or., for defendant-appellee.

Before ANDERSON, HUG, and CANBY, Circuit Judges.

**J. BLAINE ANDERSON, Circuit Judge:**

What constitutes a controlling person under the federal securities laws? While we have previously considered this question, we address it again today in hopes of dissipating some of the uncertainty obscuring this often litigated area of securities law.

This is a consolidated appeal of actions brought by Verne Buhler ("Buhler") and Norma J. Cleveland ("Cleveland") for securities violations in the sale of tax shelters. The district court granted summary judg-

ment for Anchor National Financial Services ("Anchor"), finding no liability as a controlling person. We affirm.

## I. BACKGROUND

Anchor is a securities broker-dealer with its principal office in Phoenix, Arizona. Anchor sells insurance policies, is a member of the National Association of Security Dealers, and licenses salespersons throughout the country who sell securities for it. These persons are also licensed by the states in which they sell. Defendants Audio Leasing ("Audio") and Jerden Industries ("Jerden") are corporations which leased and/or sold investments in "master recordings" as tax shelters.[1]

Buhler, Cleveland, and other claimants invested in the Audio and/or Jerden tax shelters through regional sales offices with salespersons licensed by Anchor or salespersons working for Anchor licensees. One of the sales offices was Creative Tax Shelters ("CTS"), a corporation in Bend, Oregon, which was owned by Bryson Reinhardt. CTS was operated by Reinhardt and Norman Bethany, both of whom were Anchor licensees and Anchor "principals" in that they oversaw sales by other Anchor licensees in the CTS office. They also oversaw sales by other CTS personnel who were not licensed by Anchor but were working for Anchor licensees in the CTS office.

In its endeavor to sell securities and license salespersons, Anchor established internal rules which allowed its licensees to sell only those securities approved by Anchor. The Audio and Jerden tax shelters were not recognized by Anchor as approved securities. Accordingly, while Anchor received a commission on sales of securities it had approved, no commissions or revenues were received from the sale of the Jerden or Audio shelters. The sale of unapproved securities, known as "off-book" sales, was never reported to Anchor and the Anchor name was never mentioned

---

**1.** The tax shelter program called for the purchase or lease of a master recording to produce audio records and tapes for distribution.

or disclosed in the course of the sale of the Jerden and Audio tax shelters. When Anchor was informed by the Oregon Securities Commission that a number of its licensees were suspected of violating state securities laws in connection with the Jerden and Audio tax shelters, Anchor revoked their licenses for violating the internal rule prohibiting the sale of unapproved securities.

When Buhler, Cleveland, and the other claimants failed to realize the tax benefits they had anticipated, they brought this action alleging the tax shelters were unregistered securities sold by misrepresentations and omissions of material fact in violation of federal and Oregon state securities laws. They also alleged additional theories of liability, including *respondeat superior*, fraud, failure to supervise, aiding and abetting, conspiracy, and a pattern of racketeering activity. Buhler sued Audio and other parties involved in the sales, while Cleveland sued Jerden and the similarly involved parties. Anchor was joined as a common defendant.

The district court granted Anchor's motion for summary judgment, finding Anchor was not a controlling person within the meaning of the federal securities laws.

Anchor was also granted summary judgment on the numerous additional theories of liability. On appeal, claimants allege error only with respect to the controlling person finding under federal law.

## II. ANCHOR'S LACK OF POWER

■ Under Section 15 of the Securities Act of 1933 (15 U.S.C. § 77*o* )[2] and Section 20 of the Securities Exchange Act of 1934 (15 U.S.C. § 78t(a)),[3] secondary liability is imposed upon "controlling persons." To establish that a defendant is a controlling person, a plaintiff must show that: (1) the defendant had actual power or influence over the alleged controlled person, and (2) the defendant was a culpable participant in the alleged illegal activity. *Kersh v. General Council*, 804 F.2d 546, 549 (9th Cir. 1986) (citing *Christoffel v. E.F. Hutton & Co., Inc.*, 588 F.2d 665, 668 (9th Cir.1978)). Whether a defendant has power or influence over an allegedly controlled person is a question of fact. *Kersh*, 804 F.2d at 548.

Claimants argue Anchor had actual control over CTS personnel. As evidence of Anchor's control, claimants point to the fact that Anchor had principals in the CTS office.[4] However, we find this insufficient

**2.** 15 U.S.C. § 77*o* provides:
Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

**3.** 15 U.S.C. § 78t(a) provides:
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

**4.** In granting summary judgment, the district court acknowledged that, "[T]here is a factual dispute as to whether Anchor personnel knew that CTS personnel were selling Jerden, although CTS never informed Anchor that its employees were making such sales during the time period when those sales were actually being made." Exerpt of Record at 183. Claimants argue that even if Anchor did not know of the sales, since Bethany, as principal, knew, this is attributable to Anchor under the doctrine of *respondeat superior*. While other circuits may apply *respondeat superior* in this context, *see, e.g., Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111 (5th Cir.), *reh. en banc denied*, 634 F.2d 1355 (1980); *Marbury Management, Inc. v. Kohn*, 629 F.2d 705 (2d Cir.1980), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1981); *Holloway v. Howerdd*, 536 F.2d 690 (6th Cir.1976); *Fey v. Walston & Co.*, 493 F.2d 1036 (7th Cir.1974), we have held that the controlling persons statutes supplant common-law agency doctrines. *Christoffel v. E.F. Hutton & Co., Inc.*, 588 F.2d 665, 667 (9th Cir. 1978); *Zweig v. Hearst Corp.*, 521 F.2d 1129, 1132 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). Given that the

to establish control. The principals were directed to follow the internal rules requiring Anchor approval of the securities sold. The tax shelters involved here had never been approved by Anchor, nor were they submitted for Anchor's approval. The sales were off-book, with no commissions, revenues or indirect benefits received by Anchor and its name was not used in the sales. The CTS office was operated independently from Anchor and no nexus existed between CTS and Anchor with respect to the Audio and Jerden tax shelters.[5] While Anchor may have licensed the sellers of the shelters, without more, this is insufficient to establish control. *Kersh* at 550. Anchor did not participate in the tax shelter sales and had no actual power over their licensees.

### III. ANCHOR'S LACK OF PARTICIPATION

■ Claimants also argue that Anchor's failure to adequately supervise its licensees is indirect participation in the tax shelter sales scheme. Claimants cite *Hecht v. Harris, Upham & Co.*, 430 F.2d 1202 (9th Cir.1970), to support this contention.

We acknowledge "indirect participation," commonly referred to as the "broker-dealer rule," is a theory for establishing the culpable participation component in the context of security broker-dealers. *See, e.g., Kersh,* at 804 F.2d at 550; *Hecht,* 430 F.2d at 1210. However, the failure to supervise does not constitute participation here.[6]

We believe that Anchor had no duty to supervise the off-book sales in the circumstances presented here. Anchor had no knowledge that the off-book sales were being made, and it had adopted rules against sales of unapproved securities. Anchor received no income from the sales, nor were the sales made from Anchor's offices or under its logo. The sales were not made to regular customers of Anchor, or to persons depending on Anchor's participation in any way. Anchor's conduct was limited to the mere licensing of salespersons to sell securities approved by Anchor. We cannot draw from that fact alone a duty to supervise the unauthorized actions of those salespersons, or of others acting with them, that are the subject of these lawsuits. Since Anchor had no duty, it follows that Anchor's inaction cannot be characterized as participation.[7]

### IV. CONCLUSION

The grant of summary judgment in favor of Anchor was correct. There is no evidence Anchor had actual power over the Jerden and Audio tax shelter sales and no indication that Anchor participated in the sales by failing to provide a more extensive regimentation of supervision.

---

securities laws in general were meant to impose liability only on culpable parties with enforceable control, H.R.Rep. No. 1383, 73d Cong., 2d Sess. 26 (1934), we continue to adhere to our prior holdings that the common law is supplanted by sections 15 and 20.

5. Claimants also argue that since Bethany was a principal in the CTS office and supervised the sales of the tax shelters, Anchor had influence over the salespeople in the CTS office. In short, claimants argue Bethany was Anchor. However, Bethany's status as principal is not dispositive. Bethany was not an Anchor employee. Nor did Anchor dictate to Bethany any command with respect to the Audio and Jerden

shelters. Anchor had no means of influence, direct or indirect, over any off-book sales.

6. Because the failure to supervise is not participation, it is unnecessary to decide whether the conduct was culpable, which we view as being a separate element of the participation requirement. *See Kersh,* 804 F.2d at 553, n. 6.

7. Anchor suggests that even if it is found to be a controlling person, it acted without knowledge and in good faith and therefore escapes liability under the exculpatory clauses of the statutes. Since we find Anchor is not a controlling person, we need not reach the exculpation issue.