[Nos. 20506–4–I; 20519–6–I. Division One. January 17, 1989.]

GREGORY HINES, ET AL, *Appellants,* v. DATA LINE SYSTEMS, INC., *Defendant,* DONALD E. BARNARD, ET AL, *Respondents.*

RICHARD T. SWAN, *Appellant,* v. DATA LINE SYSTEMS, INC., *Defendant,* DONALD E. BARNARD, ET AL, *Respondents.*

GROSSE, J., concurs by separate opinion.

*W. Wesselhoeft, Phil Miller, Dennis J. Dunphy,* and *Ferguson & Burdell,* for appellants.

*David D. Hoff, Howard A. Coleman,* and *Riddell, Williams, Bullitt & Walkinshaw,* for respondents Barnard, et al.

*Louis D. Peterson, Joel N. Bodansky,* and *Hillis, Clark, Martin & Peterson, P.S.,* for respondent Perkins Coie.

WEBSTER, J.—Investors of Data Line Systems, Inc. (Investors) appeal a summary judgment dismissal of their claim against the law firm Perkins Coie and Data Line's outside directors, Donald Barnard and Bruno Boin. The actions were consolidated on appeal.

## FACTS

Investors filed a complaint against the directors of Data Line, Evans Llewellyn Securities, Inc., and Perkins Coie claiming the failure to disclose material facts regarding the health of Dale Peterson, Data Line's chief executive officer (CEO) and director. In that complaint, Investors alleged violations of the Washington State securities act and the Washington unfair business practices act as well as the common law torts of negligent misrepresentation and fraud.

Data Line was organized in 1980 by Peterson and Gary Morgan to develop a product called an Optical Character Recognition Thought Reader. In February 1982, Data Line's Board of Directors authorized Peterson and other company officers to negotiate a financing plan for Data Line. After reviewing various financing alternatives, Data Line's board authorized its officers to enter into an agreement with Evans Llewellyn for the sale of stock pursuant to a private placement memorandum (PPM). On June 10, 1982, Data Line and Evans Llewellyn circulated a PPM which offered for sale 70,000 shares of the company's common stock at a price of $25 per share. Section 9 of the PPM addressed the company's dependence upon key personnel, stating:

The performance of the Company depends upon the active participation of its officers, including Dale L. Peterson, its President and Chief Executive Officer, and Gary B. Morgan, its Chairman of the Board, Executive Vice President and Chief Operating Officer, and a small group of other technical and management personnel. The loss of any of these qualified personnel could have a material adverse effect upon the Company. The Company will enter into employment contracts with its key employees and intends to purchase key man life insurance on certain of these individuals.

On June 7, 1982, 3 days prior to the circulation of the PPM, Peterson had been diagnosed as having multiple aneurysms in the blood vessels supplying his brain. He was flown from his home in Spokane to the University of Washington hospital in Seattle for surgery which was performed on June 10, 1982. All directors were advised of Peterson's hospitalization and condition prior to his transfer to Seattle for surgery. Perkins Coie was advised of Peterson's condition by June 11, 1982.

Perkins Coie had been retained by Data Line as its legal counsel with respect to the offering. On June 14, 1982, it advised that, within 30 days or before the closing on July 15, 1982, Data Line write a letter to all Investors informing

them of Peterson's ill health. Perkins Coie suggested that this would both inform as well as reassure Investors.

On June 18, 1982, Peterson's doctor discharged him from the hospital, stating that Peterson had recovered very quickly from the surgery. Peterson returned to work later that month appearing to have made a full recovery. However, prior to the surgery, a second aneurysm had been discovered. Peterson's doctor characterized this operation as "elective" surgery and recommended its removal within a year. Perkins Coie, Barnard, and Boin were not informed of a second aneurysm until sometime after October 15, 1982.

Between the period of July 15, 1982, and January 11, 1983, Investors subscribed for a total of $385,000 of stock in Data Line. Data Line decided not to disclose Peterson's health condition because by July 15, 1982, the date of the offering's first closing, Peterson had returned to work and appeared to have fully recovered.

On July 15, 1982, Perkins Coie issued a legal opinion in connection with the closing of the offering. It stated:

> Although we assume no responsibility for the factual accuracy or completeness of the Private Placement Memorandum, we have participated in the preparation of and have reviewed the Private Placement Memorandum and successive prior drafts thereof. In light of this participation and conferences with representatives of the company, no facts have come to our attention that lead us to believe that the Private Placement Memorandum contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

The opinion was addressed to Evans Llewellyn and stated: "This opinion should not be relied upon by any other persons or in connection with any other transaction."

On December 7, 1982, Peterson's second aneurysm was removed. On December 15, 1982, his surgeon wrote a letter to Morgan stating that Peterson's recovery was very uneventful and that he did not anticipate further difficulties with the aneurysms. However, his health problems persisted after the operation, and in March 1983, Peterson

submitted his resignation as president and CEO due to health reasons. Data Line did not obtain an adequate market for its product and, in July 1984, the shareholders voted to wind up the corporation's affairs.

## SELLER LIABILITY

Investors claim that the trial court erred in granting Perkins Coie's summary judgment motion regarding seller's liability pursuant to RCW 21.20.430. RCW 21.20.430(1) states in part:

Any person, who offers or sells a security in violation of any provisions of RCW 21.20.010[1] . . . is liable to the person buying the security from him or her, who may sue either at law or in equity to recover the consideration paid for the security . . .

The Washington Supreme Court has recently addressed the issue of seller liability in *Haberman v. WPPSS*, 109 Wn.2d 107, 744 P.2d 1032, 750 P.2d 254 (1987). In *Haberman*, the court adopted a "substantial factor" test holding that strict privity between seller and purchaser is not required under RCW 21.20.430(1).[2] A

---

[1]RCW 21.20.010 states:

"It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

"(1) To employ any device, scheme, or artifice to defraud;

"(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

"(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

[2]The majority of the federal circuits interpret the term "seller" to include those whose participation in the sale was a substantial factor in causing the transaction to occur. *See Anderson v. Aurotek*, 774 F.2d 927, 930 (9th Cir. 1985); *Foster v. Jesup & Lamont Sec. Co.*, 759 F.2d 838, 843–44 (11th Cir. 1985), *aff'd*, 782 F.2d 901 (11th Cir. 1986); *Davis v. Avco Fin. Servs., Inc.*, 739 F.2d 1057, 1063–68 (6th Cir. 1984), *cert. denied*, 470 U.S. 1005 (1985); *Stokes v. Lokken*, 644 F.2d 779, 785 (8th Cir. 1981); *Pharo v. Smith*, 621 F.2d 656, 665–67 (5th Cir. 1980), *rev'd in part on other grounds on rehearing*, 625 F.2d 1226 (5th Cir. 1980); *SEC v. Murphy*, 626 F.2d 633, 650 (9th Cir. 1980); *Lawler v. Gilliam*, 569 F.2d 1283, 1287 (4th Cir. 1978). The Washington Supreme Court joined the majority of federal circuits in concluding that the substantial factor/proximate cause definition of seller provides the best guidance for an analysis of seller liability under

defendant may be liable as a seller under the statute "if his acts were a substantial contributive factor in the sales transaction." *Haberman,* at 131. The *Haberman* court further stated that, "although we have interpreted the offer and sell language in RCW 21.20.430(1) to be broad enough to include face to face 'dispositions' of securities where privity is absent, we have not yet decided the scope of liability where privity is lacking." *Haberman,* at 126. Whether a defendant's conduct is a substantial contributive factor is necessarily a question of fact. *Haberman,* at 132.

In this case, we must decide whether the trial court was correct in granting a motion for summary judgment under CR 56(c). A motion for summary judgment should be granted when no issue of material fact exists. After a trial court has considered all of the facts submitted and all reasonable inferences from the facts in the light most favorable to the nonmoving party, it may only grant the motion if, from all of the evidence, reasonable persons could reach but one conclusion. *Wilson v. Steinbach,* 98 Wn.2d 434, 437, 656 P.2d 1030 (1982); *Hostetler v. Ward,* 41 Wn. App. 343, 346, 704 P.2d 1193 (1985), *review denied,* 106 Wn.2d 1004 (1986).

The *Haberman* case sets forth considerations to be used when determining whether a party's conduct is a substantial contributive factor in the sales transaction:

> (1) the number of other factors which contribute to the sale and the extent of the effect which they have in producing it; (2) whether the defendant's conduct has created a force or series of forces which are in continuous and active operation up to the time of the sale, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; and (3) lapse of time.

*Haberman,* at 131–32.

RCW 21.20.430(1). *Haberman,* at 130. *But see Sanders v. John Nuveen & Co.,* 619 F.2d 1222, 1226 (7th Cir. 1980), *cert. denied,* 450 U.S. 1005 (1981) and *Collins v. Signetics Corp.,* 605 F.2d 110, 113–14 (3d Cir. 1979), where both circuits have held that section 12(2) of the Securities Act of 1933, 15 U.S.C. § 771(2) requires privity between a plaintiff–purchaser and a defendant–seller.

We find that Perkins Coie's participation in the sales transaction is insufficient under the *Haberman* test to constitute a "seller" for purposes of RCW 21.20.430(1). Here, Perkins Coie's involvement in the transaction consisted of its role as counsel for Data Line on its stock offering. The firm at no time took on the attributes of a seller or a solicitor of buyers. Evans Llewellyn and Data Line conducted the sales transactions beginning with distributing the private placement memorandum to securing sales closings with interested investors. Both Llewellyn and Data Line's involvement had an appreciable effect in bringing about the sale. Their actions were the predominant influences on the Investors and rendered Perkins Coie's actions insignificant. Perkins Coie's role had virtually no effect on sales production. The firm did not create a force which was in continuous and active operation up to the time of the sale. We conclude that reasonable minds could not reach a different result. Perkins Coie is not a seller as a matter of law.

CONTROL LIABILITY

 Investors contend that Barnard and Boin "controlled" Data Line within the meaning of RCW 21.20-.430(3). RCW 21.20.430(3) provides:

> Every person who directly or indirectly controls a seller or buyer liable under subsection (1) or (2) above, every partner, officer, director or person who occupies a similar status or performs a similar function of such seller or buyer, every employee of such a seller or buyer who materially aids in the transaction . . . is also liable jointly and severally with and to the same extent as the seller or buyer, unless such person sustains the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable.

A director is not automatically liable as a controlling person. The plaintiff must show that the director was a culpable participant in the activities which are claimed to violate the security laws. *Burgess v. Premier Corp.,* 727

F.2d 826, 832 (9th Cir. 1984). The following factors should be considered when determining whether one is a controlling person: day–to–day involvement in business operations, previous experience in that particular business, and preparation of the corporation's business documents. *Burgess*, at 836. *See also Orloff v. Allman*, 819 F.2d 904, 906 (9th Cir. 1987) (a controlling person (1) has actual power or influence over the alleged controlled person, and (2) is a culpable participant in the alleged illegal activity), quoting *Buhler v. Audio Leasing Corp.*, 807 F.2d 833, 835 (9th Cir. 1987); *Burgess*, at 833 (liability of a controlling person under RCW 21.20.430(3) is to be given the same meaning in Washington law as it is under federal law).

The question of whether Barnard and Boin had power or influence over Data Line, the allegedly controlled person, is a question of fact. *Buhler*, at 835.[3] Investors argue that Barnard and Boin are competent and experienced businessmen who participated in Data Line's management decisions. They contend that Barnard and Boin "controlled" Data Line in its decision not to disclose Peterson's health. Viewed in a light most favorable to Investors, these contentions raise a question of material fact.

In response, Barnard and Boin contend that even if they are liable under RCW 21.20.430(3), they fall within that provision's affirmative defense which states that directors are not liable if they

> did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

RCW 21.20.430(3). However, a question of material fact has also been raised with regard to the facts Barnard and Boin

---

[3]The record does not contain any facts which would support a finding that Perkins Coie "controlled" Data Line within the meaning of RCW 21.20.430(3), that it occupied a similar status or performed a similar function to that of a director or that it was an employee of Data Line and materially aided the company in the controversy at issue. *See Burgess*, at 832. Therefore, Investors have failed to raise a sufficient question of material fact with regard to this matter.

could have, or should have, known with the exercise of reasonable care. Those facts include: Peterson's description in the PPM as an individual whose loss could materially impair the company's success and Barnard's and Boin's awareness of Peterson's surgery in June of 1982. In light of the above, the trial court erred in granting summary judgment in favor of Barnard and Boin with respect to their potential liability under RCW 21.20.430(3).

## NEGLIGENT MISREPRESENTATION

We next address Investors' contention that the trial court erred in granting summary judgment in favor of Barnard, Boin, and Perkins Coie with respect to the claim of negligent misrepresentation. Washington courts adhere to the standards of Restatement (Second) of Torts § 552(1), (2) (1977), in determining claims for negligent misrepresentation. *Haberman,* at 161. Section 552 provides:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) . . . [T]he liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

It is sufficient that the maker provides the information for repetition to a certain group or class of individuals and that the plaintiff proves to be one of them despite the fact that the maker has never heard of him by name when the

information was given. *Haberman,* at 163. *See* Restatement (Second) of Torts § 552, comment *h.*

We conclude that a question has been raised regarding whether Barnard and Boin supplied false information to Investors and whether that information influenced their decisions to purchase the securities at issue. In the PPM, they represented that Peterson was in good health and then failed to supplement the PPM as they learned of Peterson's subsequent health conditions. In their appellate briefs, Barnard and Boin admit that Investors raised an issue of material fact regarding the importance of Peterson's second brain aneurysm. Consequently, the trial court improperly granted each of these parties' summary judgment motions.

■ As to the negligent misrepresentation claim against the law firm we find that Perkins Coie breached no duty to Investors in the securities offering. The firm prudently advised Data Line to notify its investors of Peterson's health problems. The law does not require the firm to do more. Moreover, we know of no authority which imputes liability upon counsel when an injury is caused primarily by the client's failure to follow the attorney's advice. Surely Perkins Coie cannot force its client to follow its advice. Thus, we conclude that the trial court properly dismissed the misrepresentation claim against Perkins Coie.

WASHINGTON BUSINESS CORPORATIONS ACT

■ Barnard and Boin also contend that they may avoid liability under RCW 21.20.430 by invoking the Washington business corporations act, RCW 23A.08.343. This act allows directors, in performing their duties as such, to rely on the opinions prepared by counsel. RCW 23A.08.343. Barnard and Boin attempt to narrow the application of RCW 21.20-.430 by arguing that they were justified in relying on Perkins Coie to determine whether the health condition of their president and CEO was material and whether this information should have been disclosed. Although a director cannot be presumed to maintain constant vigilance over the corporation's business transactions, *Lanza v. Drexel &*

*Co.,* 479 F.2d 1277 (2d Cir. 1973), neither can he wash his hands of all corporate decisions particularly when he has access to the same facts as counsel did in the case at hand.

> [S]ecurities legislation is remedial in nature and has as its purpose broad protection of the public. Thus it is appropriate to construe the statute broadly in order to maximize the protection offered.

*McClellan v. Sundholm,* 89 Wn.2d 527, 533, 574 P.2d 371 (1978).

We affirm the summary judgment dismissing Perkins Coie and reverse and remand to the trial court for a determination on the merits as to the claims against Barnard and Boin.

GROSSE, J., and WILLIAMS, J. Pro Tem., concur.

GROSSE, J. (concurring)—I agree that as a matter of law Perkins Coie is not liable as a seller under RCW 21.20-.430(1). However, I believe that our decision must take into account the recent United States Supreme Court decision of *Pinter v. Dahl,* __ U.S. __, 100 L. Ed. 2d 658, 108 S. Ct. 2063 (1988), which was decided after *Haberman v. WPPSS,* 109 Wn.2d 107, 744 P.2d 1032, 750 P.2d 254 (1987).

The Securities Act of Washington is modeled after the Uniform Securities Act and contains a direction that the act be construed to

> effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and administration of this chapter with the related federal regulation.

RCW 21.20.900.

Although the Washington Supreme Court has interpreted this provision to require harmony rather than parallelism with the federal law, *see Kittilson v. Ford,* 93 Wn.2d 223, 608 P.2d 264 (1980), our courts cannot ignore authoritative United States Supreme Court decisions. One such decision is *Pinter.*

Pinter sold unregistered securities to Dahl, who touted the investment to the other respondents, his friends, family, and business associates. Dahl helped the other respondents complete subscription agreement forms but received no commission from Pinter when the other respondents invested on the basis of Dahl's involvement. The District Court and the Court of Appeals found insufficient evidence to support any claim against Dahl.

In turn, the United States Supreme Court reviewed the federal securities act and concluded:

> There is no support in the statutory language or legislative history for expansion of § 12(1) primary liability beyond persons who pass title and persons who "offer," including those who "solicit" offers. Indeed, § 12's failure to impose express liability for *mere participation* in unlawful sales transactions suggests that Congress did not intend that the section impose liability on *participants' collateral to the offer or sale.*

(Italics mine.) *Pinter v. Dahl,* 108 S. Ct. at 2080. The Supreme Court specifically rejected the "substantial contributing factor" test with the following reasoning:

> The deficiency of the substantial–factor test is that it divorces the analysis of seller status from any reference to the applicable statutory language and from any examination of § 12 in the context of the total statutory scheme. Those courts that have adopted the approach have not attempted to ground their analysis in the statutory language. Instead, they substitute the concept of substantial participation in the sales transaction, or proximate causation of the plaintiff's purchase, for the words "offers or sells" in § 12. The "purchase from" requirement of § 12 focuses on the defendant's relationship with the plaintiff–purchaser. The substantial–factor test, on the other hand, focuses on the defendant's degree of involvement in the securities transaction and its surrounding circumstances. Thus, although the substantial–factor test undoubtedly embraces persons who pass title and who solicit the purchase of unregistered securities as statutory sellers, the test also would extend § 12(1) liability to participants only remotely related to the relevant aspects of the sales transaction. Indeed, it might

expose securities professionals, such as accountants and lawyers, whose involvement is only the performance of their professional services, to § 12(1) strict liability for rescission. The buyer does not, in any meaningful sense, "purchas[e] the security from" such a person.

(Footnote and citation omitted.) *Pinter v. Dahl*, 108 S. Ct. at 2080–81. The Supreme Court remanded the case for further findings as to whether Dahl solicited the purchases in order to serve the financial interest of the owner or to receive a personal financial benefit from the sale.

It may well be that the emphasis of the state statute on protection of the public in contrast to the federal act, and the rule in *Kittilson*, will prove sufficient for our Supreme Court to refuse to reconsider the rule in *Haberman*. However, in the opinion of this writer the rationale of the *Pinter* Court is persuasive in that the substantial contributing factor test goes too far in subjecting securities professionals, such as accountants and lawyers, to potential liability where their only involvement is the performance of professional duties. The principal vice of the test is that it invites a simple "but for" analysis that presupposes a duty on the part of the lawyer or accountant when the focus should be on the transaction and the respective roles of the participants in it.

The principal vice of *Haberman*, if any, is not the adoption of the test itself, but rather, the statement that the determination of whether conduct meets the test is "necessarily a question of fact." That approach will subject securities professionals to the costs of defense and a trial in virtually every transaction in which there is a subsequent suit by a dissatisfied purchaser. Where it is patently clear, as it is here, that a party does not have "the attributes of a seller" it should not be subject to such a burden.

The "substantial contributing factor" test must permit an initial policy determination of whether the connection of securities professionals to a sale was too remote or insubstantial to justify the imposition of liability. As with tort law, it is for the courts to determine whether the firm stood

"'in any such relation to the plaintiff . . . as to create any legally recognized obligation of conduct for [the plaintiff's] benefit.'" (Citation omitted.) *See Hartley v. State,* 103 Wn.2d 768, 781, 698 P.2d 77 (1985). The ramifications of imposing seller liability in a case such as this would be wide indeed. Such a holding would discourage the provision of legal, accounting, or other advice and counsel for any securities offering. The scope of liability under RCW 21.20.430 must be narrowed to persons who pass title, who offer and who solicit offers, or who have those attributes.

Review granted at 112 Wn.2d 1016 (1989).